**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Jeremy James Allen, | Civ. No. 21-2689 (SRN/SGE) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Charles Brooks, and Cheryl Piepho, | |
| Defendants. | |

Plaintiff Jeremy James Allen ("Allen") moves pursuant to Federal Rule of Civil Procedure 56(a), seeking summary judgment against Defendant Cheryl Piepho ("Piepho") for deliberate indifference to his serious medical need in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## INTRODUCTION

Allen was incarcerated at Minnesota Correctional Facility-Faribault ("MCF-Faribault") from July 2017 to April 2022. On December 3, 2017, Allen broke his hand in a fall from his bunk. His broken and displaced metacarpals could not be set and cast by the onsite medical providers with the Minnesota Department of Corrections ("MDOC") or its third-party health services provider, Centurion of Minnesota, LLC ("Centurion"). Accordingly, Allen was transported offsite to District One Hospital ("DOH"), where he was treated by Dr. Bryan Armitage ("Dr. Armitage"). On December 6, Dr. Armitage found Allen's hand was still too swollen to properly set and cast, so he ordered Allen to return within two weeks when the swelling would have subsided. Allen next saw

1

Dr. Armitage on January 23, 2018. By that time, Allen's hand set in its deformed position, leaving him permanently disabled.

When Allen broke his hand, the MDOC held a "long-standing concern" that its "grossly inefficient, duplicative, and needlessly work intensive" process to approve and schedule offsite medical appointments was causing inmates to receive untimely, and thus substandard, care. The reason for the "long-standing concern" was the offsite appointment approval and scheduling process was cumbersome, requiring multiple layers of review from MDOC- and Centurion-employed medical professionals. To ensure offsite appointments (or Special Duties, as the MDOC termed them) were being timely approved and scheduled, an MDOC employee at each facility was positioned to track and maintain the entire cumbersome process. Piepho was that MDOC employee at MCF-Faribault. She was the facility's Special Duties Coordinator.

Allen's legally cognizable injury was caused by Piepho failing to ensure an onsite provider saw Dr. Armitage's December 6 follow-up appointment order—her roles throughout the third and fourth steps in the offsite appointment approval and scheduling process. By December 6, 2017, Piepho had been warned countless times by MCF-Faribault's administration that failing to ensure as much risked the health of the facility's inmates. From 2014 to 2018, Piepho received negative performance reviews, each of which harped on the administration's "concern over Special Duty follow up and tracking of medical appointments." Over the same period, Piepho was also formally disciplined numerous times for failing to submit and follow up on offsite appointment orders. In 2015, she was subject to a supervisory conference. In 2016, she received a formal oral

2

reprimand and then separately at a later date was placed on a Performance Improvement Plan.

Then, around the same time that Allen arrived at MCF-Faribault in 2017, Melissa Caffes ("Ms. Caffes") arrived as the facility's Health Services Administrator—a position numerous administrative layers above Piepho and one removed from the warden. Piepho's job performance was so poor that the continual failures to track and maintain the timely approval and scheduling of offsite appointments immediately percolated up through multiple administrative layers to Ms. Caffes. In mid-2017, Ms. Caffes began directly monitoring Piepho's day-to-day duties. She almost immediately discovered a large backlog of appointment orders that Piepho had completely and totally ignoring. In October 2017, Ms. Caffes began formally investigating Piepho. The investigation uncovered even more offsite appointment orders that Piepho was hiding. Inmates would be diagnosed with an injury, offsite care would be prescribed, that order would go to Piepho, then *nothing*. In November 2017, just *19 days* before Piepho failed to submit and track Dr. Armitage's December 6 follow-up order, the investigation concluded with a substantiated finding that Piepho had violated her professional duties by failing to timely process offsite appointment orders and develop and maintain a tracking system for offsite appointment orders, *and* had been *aware* these were her duties. In sum, just 19 days before Allen's legally cognizable injury, the MDOC found Piepho had been deliberately indifferent in the *exact* manner that caused Allen's injury.

In addition to Piepho's extensive disciplinary record, the 150 non-party inmate files obtained in discovery demonstrate Piepho's direct role in the suffering of *countless*

inmates. These records evidence Piepho neglecting appointment order after appointment order and in turn, witnessing how failing to track and maintain the timely approval and scheduling of offsite appointments inevitably led to the delayed provision of offsite care. In one instance, an oncologist documented his frustrations, writing that an inmate—who had been diagnosed with "high grade prostate cancer" eight months prior—was receiving no substantive treatment due to the failure to coordinate even his staging appointments. The oncologist mused how to treat a patient whose care could not be reliably approved and scheduled, writing he thought it best to bypass further imaging because "I think coordination would delay more definitive treatment that we all just really want to get started on." This story is not extreme or rare. In another example, an oncology department wrote directly to MCF-Faribault regarding an inmate whose lymphoma was going untreated that "We have not been able to reach you by phone to schedule an appointment for you."

When Allen returned to MCF-Faribault from his appointment with Dr. Armitage on December 6, Piepho wrote in Allen's paper medical chart "Seen by Dr. Armitage for ortho FU. Dictation returned. Will put out for MD to review." Then, *nothing*. The order would not be seen for another sixteen days. By that time, Allen's hand was permanently deformed.

## BACKGROUND

I.      Facts

      **A.      MCF-Faribault's offsite appointment approval and scheduling process**

As an inmate at MCF-Faribault, Allen's health was entrusted to the MDOC, who

contracted for the provision of health services with Centurion. The agreement between the two organizations necessitated the two interlock. The MDOC maintained nursing, administrative, and staff to stay in charge of, provide certain care to, and oversee and coordinate inmates' treatment. It then had to blend its services with Centurion's primary care providers and administrative staff who reviewed whether any specialized care was medically necessary. (Ex. F5 at 6–24; Ex. K1 at ¶ 24; Ex. K2 at ¶ 24; Ex. H1 at xii, 97–98; *see* Ex. C4, Lipinski Dep. at 16:3–25:18.)

The medical services offered onsite at any MDOC facility were, however, limited. (Ex. F4 at 1; Ex. F5 at 6–24.) Inmates who needed specialized care were sent to offsite clinics or hospitals. For example, under Centurion's Clinical Guidelines, a broken bone like Allen's would "require immediate attention only available off-site." (*See* Ex. F5 at 19.) When an offsite provider, like Dr. Armitage, ordered a follow-up appointment, like he did on December 6, approving and scheduling the appointment demanded the completion of an eight-step process. (*See* Ex. F1 at 1–3; Ex. F5 at 6; Ex. C1, Piepho Dep. at 8:18–25; Ex. C2, Brooks Dep. at 39:6–14; Ex. C3, Caffes Dep. at 15:6–35:16.)

**First**, for security purposes, inmates were precluded from knowing the details of any upcoming offsite appointment. (*E.g.*, Ex. E7 at 26112.) Thus, the MDOC's transportation team carried an inmate's "packet" (containing any appointment records or "dictation" from the day's appointment) from the offsite appointment. When an inmate returned to MCF-Faribault, transportation **handed off** the packet to an MDOC-employed nurse. (*E.g.*, Ex. A1 at 2354 (12/6 progress note); *see* Ex. C2 at 27:23–39:14; Ex. C3 at 15:12–16:19.)

5

**Second**, the nurse checked the inmate's vitals and noted in the inmate's paper medical chart (or "progress notes") the offsite provider's diagnosis and order, then **handed off** the packet—now containing the dictation and progress notes—to an MDOC employee in MCF-Faribault's Office of Administrative Specialists ("OAS"). (Ex. E4 at 26264 ("[I]t is expected practice that on return from an appointment the [packet] is delivered to OAS Sr. Piepho."); Ex. F1 at p. 2 ("Paperwork from appointment is brought back to special duty person."); Ex. D2 at 2811, ¶ 2(c); *see* Ex. C2 at 39:8–14; *e.g.*, Ex. A1 at 2354 (12/6 notes).) Piepho was the nurse administrator in MCF-Faribault's OAS solely charged with overseeing the facility's appointment approval and scheduling process. (Ex. E4 at 26264; Ex. D1, at 2806; Ex. D2 at 2808, 2811.)

**Third**, Piepho's roles began with reviewing the packet, highlighting the offsite provider's diagnosis and treatment plan in that day's dictation and writing these details in the progress notes. (Ex. F1 at 2–3; *see* Ex. D2 at 2811, ¶ 2(c), (f); *e.g.*, Ex. A1 at 2469–70.) She then **handed off** the packet—now including the progress notes and highlighted dictation—to an onsite provider. (Ex. D2 at ¶ 2(c), (f); Ex. F1 at 2–3; Ex. E4 at 26264; Ex. C3 at 17:21–24:23; Ex. C1 at 39:25–42:13; *see* Ex. C4 at 20:19–27:11.) Piepho's process memorandum urged writing in the progress notes which onsite provider was provided the packet and placing the packet with the onsite provider who had been working with an inmate. (Ex. F1 at 2–3 ("In the progress notes enter what was received and which provider you put that information out to for review. Put chart in provider's box."); Ex. C1 at 30:2–31:16; *see* Ex. C2 at 30:4–18.)

**Fourth**, the onsite provider needed to sign the dictation pages with the offsite

6

specialist's diagnosis and treatment plan, and complete the top half of a Consultation and Specialty Services Request Form ("Centurion Form"). (Ex. F5 at 6; *e.g.*, Ex. A1 at 2483–89 (signed 12/3 dictation), 2478 (12/4 Centurion Form).) The packet—now including highlighted and signed dictation, progress notes and Centurion Form—was then **handed back** to Piepho. (Ex. E4 at 26264 ("[T]he onsite practitioner is expected to sign the written consultation form and make recommendations for care prior to return to Cheryl Piepho for filing in the medical record.")

Importantly, Piepho had a role even *during* the onsite provider's review. Her professional duties explicitly included meeting with the onsite providers *daily* to review pending offsite appointment orders. (Ex. D2 at 2811, ¶ 2(c), (f).) As Piepho summarized, "The nursing staff brought to the attention of the doctor everything that's supposed to happen. The doctor, if he didn't order anything that was needed, he was reminded again, and then they usually did[.]" (Ex. C1 at 60:15–60:21.) The five onsite providers were Dr. Edward Shaman ("Dr. Shaman"), Dr. Patricia Fontaine ("Dr. Fontaine"), Dr. Jeffrey Felt ("Dr. Felt"), Dr. Lawrence Lorbieki ("Dr. Lorbieki") and P.A. Gene Kliber ("P.A. Kliber")). The onsite optometrist was Dr. Michelle Taylor ("Dr. Taylor").

**Fifth**, Piepho needed to submit the packet to an offsite Centurion location for utilization management ("UM") review. (Ex. F1 at 1 ("Request Form and chart are received from provider."); Ex. F5 at 6; Ex. C1 at 57:16–59:18; Ex. C4 at 20:19–24:6.) This required Piepho create an Off-Site Scheduling Log Entry Form ("OSSLEF") in the Off-Site Scheduling Log ("OSS Log")—the electronic system used to track appointments and share medical records between the MDOC's facilities and Centurion's central office.

(Ex. F1 at 1; Ex. C4 at 43:18–44:11; *e.g.*, Exs. B1–4.) Piepho logged the offsite order's information in the form section of the OSSLEF, scanned and attached the packet materials to the OSSLEF and saved the OSSLEF into the OSS Log. (Ex. F1 at p. 1; *see, e.g.*, Ex. B1–4.) The OSSLEF then populated the workflow of Centurion's UM staff.

**Sixth**, Centurion's UM staff reviewed the packet and, whether an appointment was approved or denied, filled out the Centurion Form's bottom half. The packet—now including the highlighted and signed dictation, progress notes, and completed Centurion Form—was **handed off** to Centurion's schedulers. Before that hand off occurred, Piepho *still* had a role in the process. Her professional duties required monitoring and following up with Centurion's UM staff to ensure appointment orders were being seen and timely processed. As she explained, "We were always contacting Centurion and asking when the appointments were going to be set up because Centurion had a lot of appointments to set up, and yes, we would be on them questioning what's going on." (Ex. C1 at 61:5–9.)

**Seventh**, Centurion's schedulers (even if the appointment was prearranged by the offsite provider) received a date and time. They next created a Scheduling Confirmation, a cover page with the appointment's date, time and location. The packet—now including the signed and highlighted appointment records, the progress notes, the completed Centurion Form, and the Scheduling Confirmation—was **handed back** to Piepho. But, before any appointment was definitively set, Piepho was able to contact Centurion's schedulers to see if it could be moved up. (*See, e.g.*, Ex. L13 at 21121.)

**Eighth**, Piepho next arranged transportation for the appointment by, *inter alia*, pulling the digital OSSLEF attachments back into a physical packet. (Ex. F1 at 1–2.)

Once Piepho **handed off** the packet to transportation, the process was complete.

When the process began with an inmate presenting to an onsite provider (as opposed to an offsite provider), Piepho's responsibilities began at step four. When no dictation returned from an offsite appointment, the process necessitated Piepho follow up with the offsite specialist to obtain the dictation.

### B.      Piepho's position description

Piepho's position description from April 2016 to March 2018 classified her as Senior Office and Administrative Specialist; her working title was Special Duty Coordinator. (Ex. D2 at 2808; *see* Ex. C1 at 6:9–8:2.) According to Ms. Caffes, Piepho had a "very crucial position" at the facility because any lack of care or accountability in managing the flow of offsite orders was "a set up for risky patient care and potential litigation." (Ex. E11 at 26164.) Accordingly, Piepho's position description urged her to act "with considerable freedom and discretion in performing duties necessary to accomplish tasks." (Ex. D2 at 2816.)

Piepho was the only employee at MCF-Faribault responsible for overseeing the offsite appointment approval and scheduling process. (Ex. D1 at 2806; Ex. D2 at 2808, 2811, ¶¶ 1–4; Ex. C1 at 5:19–7:11; Ex. C3 at 23:10–24:23.) Her professional duties included several oversight and policy functions regarding MCF-Faribault's offsite appointment approval and scheduling process:

- ▪ Direct, establish, and revise the implementation of policy, directives and instructions related to Medical Special Duty appointments so that all areas of responsibility effectively carry out the goals and objectives of MCF-Faribault and the MDOC. (Ex. D2 at 2811, ¶ 3.)

- Develop and maintain tracking system for Special Duty Appointment Log; monitoring contract vendor for compliance with turnaround time; and quality expectations. (*Id.* at 2811, ¶ 2; *see* Ex. F1 at pp. 1–3.)

- Maintain a tracking system for all dictation to ensure that all dictation is received and filed. (Ex. D2 at 2810, ¶ 4.)

- Serve as Transcription Coordinator for Health Services, including monitoring contracted services for compliance with turnaround time and quality expectations. (*Id.* at 2811, ¶ 4.)

Piepho's position description also imposed duties to control and oversee each step

in the day-to-day administration of the offsite process, including:

- Process requests for Special Duty Consultations. (Ex. D2 at 2811, ¶ 2(a).)

- Review medical dictation and place in medical file on a timely basis (within one working day unless delay is approved by supervisor). (*Id.* at 2810, ¶ 3.)

- **Review documentation received from consulting medical providers** and **forward all documentation to medical provider for further review and recommendations**. Review for appropriate signatures by primary medical provider. (*Id.* at 2811, ¶ 2(c) (emphasis added).)

- Prepare for in-house consultant visits. Pull medical records. (*Id.* at 2810, ¶ 6.)

- Make medical records available to nurses, physicians, dental staff and consultants when needed and ensure proper filing of all medical records. (*Id.* at ¶ 5.)

- Follow up with outside consultants when documentation not received. (*Id.* at 2811, ¶ 2(d).)

- **Meet with Medical providers daily to review status of special duty appointments**. (*Id.* at ¶ 2(f) (emphasis added).)

- Prepare appointment information and relaying to transportation staff.

10

(*Id.* at ¶ 2(b).)

- File all completed Special Duty Appointment documentation in the medical record when complete. (*Id.* at ¶ 2(g).)

- Ensure all correspondence is dealt with in an efficient, timely manner. (*Id.* at 2810, ¶¶ 4, 7.)

- Monitor contracted services for compliance with turnaround time and quality expectations. (*Id.* at 2811, ¶ 4.)

As summarized, Piepho's overall professional duty was to "Direct and coordinate Special Duty processes so that all scheduled medical appointments are processed timely and accurately." (*Id.* at 2811.)

### C.    Piepho's employment record

#### 1.    Piepho's performance reviews

From 2014 to 2018, Piepho's job performance was assessed negatively, with each review harping on the administration's "concerns over Special Duty follow up and tracking of medical appointments." (Ex. E3 at 5311–13; Ex. E2 at 5317–21; Ex. E1 at 5322–25.) In 2014 and 2015, Piepho was found to struggle with "Special Duty appointments and keeping paper flow well organized and efficient" and to have "been lacking" with following up on reviewing and tracking offsite appointment orders. (Ex. E1 at 5323.)

In 2015 and 2016, MCF-Faribault's administration found:

> **We continue to express our concerns** over Special Duties follow up and tracking of medical appointments. Oral Reprimand was given 2-16-16 for violating job description responsibilities. Since then Cheryl has given some effort in ensuring that she is **following up** on future appointments. **She needs to continue to bring the follow up charts to the providers ensuring that they are signing off on new orders and ordering follow**

11

**up consults after medical appointments**.

(Ex. E2 at 5318 (emphasis added).)

Piepho's performance from March 2016 through March 2018 was markedly worse. (Ex. E3 at 5311–13.) Piepho was having significant problems maintaining and controlling offender medical records, which was interrupting the "continuity" of inmate care. (*Id.* at 5311) She was also failing to maintain medical records so the Health Service Department functions ran smoothly and efficiently. (*Id.*)

### 2.    Formal disciplinary actions

From 2015 through 2018, Piepho was subject to countless sustained disciplinary actions.

### a.    December 2015

In December 2015, numerous missed offsite appointment orders were discovered by Rhonda Thompson ("Ms. Thompson"), MCF-Faribault's Nurse Supervisor. (Ex. E4 at 26262.) The discovery led MCF-Faribault's administration to direct Nola Karow ("Ms. Karow") to investigate Piepho for violating the professional duties in her position description by failing to: (1) review dictation received from offsite specialists and forward to an onsite provider for approval; (2) review dictation for onsite provider signatures; and (3) develop and maintain a tracking system for offsite appointment orders. (Ex. E4 at 26262.)

Piepho's explicit professional duties included tracking and maintaining the timely approval and scheduling of offsite appointment orders, as well as develop a system for ensuring as much. (*Id.* at 26272, ¶ 2(a), (c), (e), (f), ¶ 3.) Nevertheless, Piepho outright

admitted she had been disregarding these duties:

> **When [Piepho] was asked to describe her process** for monitoring records to ensure that process is followed accurately, **she was not able to articulate a tracking system**. She reports that she puts a chart out for the doctor, he reviews it, and returns to her. When asked how she tracks if a chart is not returned to her desk she stated **"I don't have time to track it, the nurses need to make sure they are putting the chart back on my desk."** When asked if she tracks **urgent** or **time sensitive** appointments differently, **she responded "no."**

(*Id.* at 26263 (emphasis added).) As Ms. Karow summarized, "By [Piepho's] own testimony, she does not have an internal tracking system to monitor requests and follow-ups." (*Id.*)

Piepho's disregard for the delivery of offsite care was further clarified in Ms. Thompson's interview with Ms. Karow. (*Id.* at 26264.) As Ms. Thompson explained, "it is expected practice that on return from an appointment the [packet] is delivered to OAS Sr. Piepho." (*Id.*) The packet is then provided by Piepho to an onsite provider. (*Id.*) After Piepho obtains the signed packet, only then should she file it in the inmate's medical file. (*Id.*)

Ms. Thompson detailed three examples of how Piepho's disregard for her professional duties obstructed the provision of offsite care. (*Id.*) First, on November 25, 2015, Ms. Thompson received an inmate Kite asking about future offsite care. (*Id.*) After reviewing the inmate's medical file, Ms. Thompson discovered an ordered offsite appointment was already one-week late. (*Id.*) Piepho had filed the order in the inmate's medical file before providing it to an onsite provider. (*Id.*) As a result, no onsite provider had ever reviewed or signed the order and thus no offsite appointment was ever approved

13

or scheduled. (*Id.*) Second, an inmate's baclofen pump was ordered to be refilled before October 15. (*Id.*) On October 14, Ms. Thompson discovered the order in the inmate's medical file; no onsite provider had ever reviewed (or signed) the packet and thus no appointment had been approved or scheduled. (*Id.*) In yet another example, an inmate was ordered to receive a Remicade injection in early-November 2015. (*Id.*) Ms. Thompson discovered the order in the inmate's medical file; no onsite provider had ever reviewed (or signed) it and thus no appointment had ever been approved or scheduled. (*Id.*)

The evidence of Piepho's misconduct was presented to her in an investigatory interview, (*Id.* at 26264.), and at a supervisory conference, (Ex. E6 at 5333.) The committee that reviewed the investigation's findings directed Piepho receive an oral reprimand and be placed on a Performance Improvement Plan ("PIP"). (Ex. E4 at 26259–60.) On February 16, 2016, Piepho received a letter stating she was being orally reprimanded for violating the professional duties in her position description. (Ex. E5 at 5349.) The letter specifically stated the disciplinary action was justified because Piepho had "failed to review medical documentation received from consulting medical providers and forward all documentation to medical provider for further review and recommendations." (*Id.*) Additionally, Piepho failed to "review for appropriate signatures by primary medical provider, and failed to develop and maintain tracking system for maintaining Special Duty Appointment Log." (*Id.*)

On May 2016, Piepho was placed on a PIP. She was thereby ordered to ensure the offsite process is timely completed and to continuously monitor follow-up appointments

14

so future appointments are not missed. (Ex. E4 at 5333; Ex. E2 at 5320–21.)

### b.    January 2017

In January 2017, Ms. Thompson spoke to Piepho about how to better notify staff of the inmates that had pending offsite appointments. (Ex. E6 at 5329.) Piepho took the comment to reference an incident where an inmate was transferred to another facility despite a pending offsite surgery appointment. (*Id.* at 5336) She responded by becoming upset and loudly yelling "I am sick of being accused by you and constantly calling me a liar, you do this all the time, you're always back here looking into my things and accusing me of lying." (*Id.*) On March 9, 2017, Piepho received a verbal reprimand for unprofessional conduct. (*See* Ex. E16 at 26211.)

### c.    Summer and early-Fall 2017

In September 2017, Ms. Caffes reported discovering numerous offsite appointment orders that had been written in July and August but had yet to be submitted for review and thus had never been approved or scheduled. (Ex. E7 at 26079.) This was not an anomaly. Ms. Caffes reported making numerous similar discoveries over the preceding months. (*Id.*) Accordingly, MCF-Faribault's administration directed Ms. Karow to, once again, investigate Piepho. (*Id.*) The specific allegations were that Piepho had violated her position description on several occasions between June and September 2017 by failing to: (1) timely process offsite appointment orders; and (2) develop and maintain a tracking system for ensuring offsite orders were timely processed. (*Id.*)

Ms. Karow interviewed Ms. Caffes, MCF-Faribault's Health Services

15

Administrator, a position responsible for overseeing the facility's delivery of health services. (*Id.* at 26080–81.) Ms. Caffes stated that, on arriving at MCF-Faribault in mid-2017, she uncovered **a backlog of offsite appointment orders** that Piepho had failed to process and thus were never approved or scheduled. (*Id.* at 26080.) As Ms. Karow noted, Ms. Caffes "describes that through July and August she uploaded the majority of the backlog of special duty consultations and developed a tracking system to assist in monitoring timeliness of entry and follow up." (*Id.*)

By Ms. Caffes's diagnosis, there were "a large number of problems" with the timeliness of fully completing the offsite appointment approval and scheduling process. (*Id.*) It was clear to Ms. Caffes as of July 2017 that Piepho was failing to track offsite appointment orders through the process's completion and still had no system to ensure timely completion of the process. (*Id.*) Ms. Caffes sought to correct these glaring shortcomings, advising **that offsite appointment orders should be uploaded by Piepho to the OSS Log when the packet first returned from the nursing staff, not only after returning to Piepho from the onsite provider**.

As part of implementing the procedural modification, Ms. Caffes "met with [Piepho] on numerous occasions during this time period and discussed the importance of keeping current with appointment requests and tracking timeliness of process." (*Id.* at 26080.) As Ms. Karow noted:

> [Ms. Caffes] reports that she instructed [Piepho] to maintain the tracking system in order to ensure that appointments were processed in a timely manner. [Ms. Caffes] also reports that on **several occasions** she met with [Piepho] … **re-enforcing that a tracking system was necessary to ensure appointment requests and follow up does not get missed**.

16

(*Id.*) Not only was Piepho told as much in numerous in-person meetings and training sessions, "these conversations were also documented in e-mails sent to [Piepho that] clearly document[ed] work expectations." (*Id.*)

Despite numerous conversations, explicit instructions, training sessions, staff assistance, and regular staff check-ins on the subject, Piepho refused to follow Ms. Caffes's tracking system or otherwise track and maintain the timely approval and scheduling of offsite appointments. (*Id.* at 26080–81.)

In September 2017, Centurion contacted Ms. Caffes after Piepho told Centurion's UM staff about **a *new* backlog of offsite appointment orders**. (*Id.* at 26081, 26083 (e-mails), 26093 (#11).) Piepho told Centurion that she was in possession of **70 appointment orders which she had yet to begin processing**. (*Id.* at 26081, 26093 (#11).) When confronted by Ms. Caffes, Piepho denied making the statement but then conceded to being **40 appointment orders behind**. (*Id.* at 26081.) Ms. Caffes was in disbelief. She asked Piepho how that could be possible, given the majority of the initial backlog was current as of the end of August, only *weeks earlier*. (*Id.*) Piepho simply responded, 'I don't have time to do it all.' (*Id.*)

Questioned by Ms. Karow about Ms. Caffes's tracking proposal, Piepho said she "knew it would fail." (*Id.* at 26082.) Asked whether she had responsibility for any failures, Piepho responded "I had nothing to do with it" and "Nothing was ran by me." (*Id.*) When asked if she had any ownership over any failures, Piepho responded "No, it wasn't my problem." (*Id.*)

17

Piepho's statements were directly contradicted by the vast record developed by the investigation. For example, Ms. Caffes presented a file of messages in which Piepho was instructed on the need to track and maintain the overall offsite appointment approval and scheduling process and that failing to do as much risked the health of the facility's inmates. (*Id.* at 26092–93.) For example, in June and July 2017, Piepho was told how to track appointments through the OSS Log in numerous separate discussions. (*Id.* at 26092 (#1–5).) One e-mail provided Piepho with a direct example of a missed appointments that would have timely occurred if she had only tracked and maintained the process. (*Id.* at 26092 (#6).) In another e-mail, Piepho was directly informed that her failure to track and maintain the process was causing offsite appointment orders to "[fall] through the cracks." (*Id.* at #7.) Another e-mail recounted Piepho failing to follow up on outstanding offsite appointment orders. (*Id.* at #9.) Another e-mail detailed how Piepho missed an urgent offsite order for a CT scan of an inmate's abdomen, which would have been discovered if she properly tracked and maintained the process. (*Id.* at #10.) In yet another example, Piepho was informed that an inmate missed a chemotherapy session because of her failure to track and maintain the process. (*Id.* at 26093 (#15).)

Ms. Caffes assigned two MDOC employees to work through the new backlog— Ms. Thompson and Robin Ouellette ("Ms. Ouellette"), who was Piepho's junior in the OAS. (*Id.* at 26081.) Their review located *even more untimely offsite appointment orders* that Piepho was hiding. In one example, Mses. Ouellette and Thompson discovered six offsite appointment orders written in July and August that Piepho had begun processing but, as of September, had yet to be reviewed by an onsite provider. (*Id.* at 26081, 26093

(#12).) In another example, Ms. Thompson confronted Piepho about loose dictation that had been sitting in a folder on Piepho's desk for three-to-four weeks without being filed. (*Id.* at 26081.) Piepho reportedly responded, "I can't find the charts." (*Id.*)

In yet another example, Ms. Thompson reported finding 11 offsite appointment orders tacked to a board behind Piepho's desk. (*Id.* at 26110.) Two were approvals of the *same appointment*, written by separate onsite providers, two-and-a-half weeks apart. (*Id.*) As Ms. Thompson explained, "I am assuming the second provider wrote another request thinking the first provider had forgotten to write it." (*Id.*) Accordingly, Ms. Thompson explained to Piepho that failing to timely provide onsite providers with up-to-date information impacted all of health services. (*Id.*) She urged Piepho that "Not only [are these offsite appointment orders] part of [the inmate's] medical history, it is also a form of communication between [Health Services] staff." (*Id.*)

When directly asked by Ms. Karow whether Piepho's behavior was purposeful, Ms. Caffes stated she believed **Piepho was "purposefully disregarding" her professional duties and explicit directions from MCF-Faribault's administration**. (*Id.* at 26080–81.) Ms. Caffes presented evidence of as much. A supervisory note dated October 31, 2017, describes an event where Piepho was confronted by Ms. Caffes about an offsite appointment order that was already late but had yet to be uploaded for tracking or reviewed by an onsite provider. (*Id.* at 26090–91.) Piepho falsely claimed processing the order was another's responsibility before being directly ordered by Ms. Caffes to immediately upload the order and provide it to an onsite provider. (*Id.* at 26090.) Piepho said she would. (*Id.*) However, she lied directly to Ms. Caffes's face. (*Id.*) Instead of

19

uploading the order or providing it to an onsite provider, she placed it on a cart amongst numerous other packets. (*Id.*) At day's end, Ms. Caffes found the order sitting on the cart, still un-uploaded and un-reviewed. (*Id.*) When confronted as to *why* she had disobeyed a direct order, Piepho stated she did not have the time. (*Id.*)

On October 30, Piepho was interviewed by Ms. Karow and presented with the investigation's findings. (Ex. E8 at 3152; Ex. C3 at 68:24–79:13.) On November 17, Ms. Caffes served Piepho with a disciplinary letter that stated the allegations against her had been substantiated and served as a written reprimand for failing to timely process offsite appointment orders. (Ex. E8 at 3152; Ex. C3 at 68:24–79:13.) On March 21, 2018, Ms. Larson served Piepho with a letter stating Piepho's appeal was denied and thus Piepho would need to serve the one day suspension that came with the written reprimand. (Ex. E9 at 26054.) At end, the final disposition of the formal written reprimand stated:

> The investigation also supported [Piepho] violated her position description, Responsibility #1, by failing to process special duty request and appointments in a timely matter and Responsibility #2, develop and maintain tracking system for maintaining Special Duty Appointment Log. While **[Piepho] denies this was her responsibility**, the allegation is supported by offender medical records, as well as the testimony and documentation provided by supervisory staff that **[Piepho] was aware of her responsibility and failed to report to her supervisors the back log of special duty appointments not tracked from June-September 2017**.

(Ex. E10 at 5350 (emphasis added).)

### d.    The 2017 PIP

On November 21 and December 1, Mses. Thompson and Caffes met with Piepho regarding the PIP implemented as part of the formal written reprimand. (Ex. E12 at 26151–52.) They reiterated what they had been telling Piepho for months, if she did not

want to follow Ms. Caffes's tracking system, she would need to create a functional

tracking system herself. (*Id.* at 26152.) As would be recounted, "management did create a

tracking log, but Ms. Piepho was not amendable to the log that was created. Management

suggested that Ms. Piepho should then create one to her liking." (*Id.* at 26145.)

### e.      November and December 2017

On January 26, 2018, Bonnie Bodermeier ("Ms. Bodermeier")—the Nurse

Supervisor of MCF-Red Wing—was asked by Ms. Karow to lead an investigation into

ongoing "concerns regarding Piepho's job performance and her potential lack of

accountability." (Ex. E11 at 26162.) Ms. Bodermeier was brought in to provide an

objective perspective, given Piepho's supervisors had been engaged in Piepho's day-to-

day professional duties by providing feedback, assistance and coaching. (*Id.*)

The specific allegations against Piepho were that, since October 2017, she had

failed to: (1) show demonstrable improvement in the goals established in her December

2017 PIP; and (2) track and maintain the offsite appointment approval and scheduling

process. (*Id.*)

Ms. Bodermeier interviewed three senior administrators at MCF-Faribault:

Mses. Caffes, Thompson and Nurse Supervisor Jody Ohnstad ("Ms. Ohnstad"). (*Id.* at

26163–66.) Ms. Caffes told Ms. Bodermeier of Piepho's performance:

> **There are problems everyday** with things falling through the cracks
> regarding the log. **I have to follow up on everything because [Piepho]
> will just not do it**. **She needs continuous oversight**. We have provided her
> help on the night shift and **have attempted many times to help her create
> a system to track offsite [appointments orders] that is more efficient
> and creates less errors**.

21

(*Id.* at 26164.) As Ms. Caffes explained, Piepho had a "very crucial position" at the facility because "if a better system does not get put in place, **it is a set up for risky patient care and potential litigation**." (*Id.*) At end, Ms. Caffes did not believe Piepho was capable of change, saying Piepho "**just does not place value on the process and is not taking any accountability for the problems that are occurring**." (*Id.*)

Like Ms. Caffes, Ms. Thompson lamented that offsite appointment orders "keep falling through the cracks." (*Id.* at 26164–65.) She stated Piepho was "not following direction given regarding special duty appointment tracking." (*Id.*) Additionally, she reported **the onsite providers "are frustrated because of breakdowns in the system that tracks offsite appointments and receiving dictation for follow up timely."** (*Id.*) At end, Ms. Thompson stressed the continuous "breakdowns due to an unreliable tracking system" were **"a high risk"** jeopardizing inmate health. (*Id.*)

Ms. Ohnstad's comments were even more scathing. (*Id.* at 26165.) According to Ms. Ohnstad, Piepho had **a history of** failing to provide offsite appointment orders to onsite providers and of "**not provid[ing] truthful or accountable answers**" and "not following the rules." (*Id.*) Ms. Ohnstad also expressed concern the "continual errors that are occurring" are "**a tremendous liability**" and that her nursing license is "subject to question and vulnerability due to [Piepho's] poor accountability and work methods." (*Id.*) Accordingly, Ms. Ohnstad reported starting her own file on Piepho's continuous failures to maintain and track offsite appointment orders, should there ever be a question as to Ms. Ohnstad's responsibility over the issues. (*Id.*)

Ms. Bodermeier's disgust with Piepho is apparent in the summaries of two

interviews in which Piepho displayed legitimately concerning, bordering pathological, behavior. (*Id.* at 26165–66.) When Piepho was asked generally about her performance, Piepho stated "no one has the ability to do many of her tasks." (*Id.* at 26166.) Piepho at numerous times stated "she needs more help," never once acknowledging she was currently receiving help from the night nursing staff. (*Id.*)

Piepho was directly asked about the allegations that her process was not working and her record of missed appointments. (*Id.*) Despite the night nursing staff only aiding Piepho's professional duties (and Piepho's insistence that she needs help), Piepho deflected blame by stating "she doesn't do the request anymore and that they are now routed through the night nurse staff who is responsible for the uploading any new request." (*Id.*) Piepho then stated, "I am out of the loop and I need to be back in the loop." (*Id.*)

When asked whether she had taken steps to follow directives in her PIP, Piepho was "evasive in her answers" and repeated the procedure now was "not good" and that missed appointments "are going to happen again." (*Id.*) Piepho then stated, despite being urged to create a workable process, "they need to just give it back to me (referring to the whole offsite process)." (*Id.*) She then stated the process now is "ridiculous" and that she has "actively sought out Ms. Thompson to review the progress of the offsite system" and she "doesn't know how the communication for the process is supposed to be passed along." (*Id.*) At end, Piepho "repeated that she does not have any responsibility in missing or incomplete records, and that nurses are not following the proper process." (*Id.*)

Piepho's answers were clearly contradicted by the materials gathered during the

investigation. In one example, an inmate was evaluated offsite for prostate cancer on December 6, 2017, and ordered to return imminently for a biopsy. (Ex. E12 at 26114.) Piepho did not provide the follow-up order to an onsite provider until December 26. (*Id.*) The order was approved that day, the biopsy occurred on January 18, 2018, and the inmate was ordered to return on January 24 to review the procedure's results. (*Id.*) Weeks later, on February 1, P.A. Kliber noted there was still no biopsy results in the inmate's medical file. (*Id.*) On February 6, Ms. Ouellette found the follow-up order in a pile of packets on Piepho's desk. (*Id.*) The order was unsigned. (*Id.*) Piepho had never even set it out for an onsite provider's review. (*Id.*) Ms. Ouellette immediately presented the order to P.A. Kliber, who immediately approved. (*Id.*) The follow-up appointment confirmed **the inmate had cancer**. (*Id.*)

In another example, Ms. Ohnstad was reviewing an inmate's medical file on January 29, 2018, when she discovered several issues. (Ex. E11 at 26180–82.) The inmate had a prostate biopsy on December 20, 2017, and was ordered to return in two weeks to review the procedure's results. (*Id.* at 26180.) As of Ms. Ohnstad's review, no follow up had occurred. (*Id.*) She spoke with Dr. Shaman who reported he was still awaiting the biopsy's results. (*Id.*) Despite Dr. Shaman signing off on the follow-up appointment, Piepho never obtained the biopsy's results or submitted Dr. Shaman's approval to Centurion. (*Id.*) When confronted, Piepho stated "I don't know what happened." (*Id.*) Piepho later sought out Ms. Ohnstad to claim Centurion had denied the follow-up order. (*Id.*) When asked to produce any documentation of Centurion's decision, Piepho could find none. (*Id.*) According to Ms. Ohnstad, Dr. Shaman "was upset and said

24

the biopsy revealed [the inmate] **has cancer and we have been sitting on this** since [December]." (*Id.*)

In another example, the dictation from an eye appointment on March 3, 2017, was found 11 months later, un-reviewed, sitting loose in folder of papers on Piepho's desk. (Ex. E12 at 26115.) In yet another example, a November 4 Supervisory Note documented Ms. Caffes scolding Piepho for failing to see that an inmate was ordered to undergo further care, a fact that would have been apparent if Piepho had only flipped back one page to see the clear order on May 31 for a follow up within two months (then long passed). (*Id.* at 26136.)

At end, Ms. Bodermeier found the allegations against Piepho were supported. (Ex. E11 at 26168.) Piepho had failed to show any demonstrable improvement as to her PIP and was failing to perform the duties in her position description. (*Id.*) According to Ms. Bodermeier, her conclusion was supported by the supervisory staff providing **consistent and supported testimony** that Piepho failed to create a system to track offsite appointment orders. (*Id.*) She also found that **Piepho knew as much was her professional duty**, given the continuous errors in the process were addressed with Piepho as they arose. (*Id.*)

On April 28, 2018, Piepho was served a disciplinary letter stating that she was receiving a one day disciplinary suspension without pay for failing to show demonstrable improvement in goals established in her PIP and failing to perform the duties and expectations in her position description. (Ex. 13 at 26145.) Specifically, Piepho had failed to create a system to track and maintain offsite appointments. (*Id.*) Piepho chose to appeal

25

the finding. (Ex. 12 at 26145.) Her union representation did not put up much of a fight, arguing only a procedural basis for overturning the disciplinary action. (*Id.*) Management denied the appeal. (*Id.*)

f.      **Early-2018: Piepho continuing to abuse coworkers, sabotaging offsite appointments**

In May 2018, Nurse Supervisor Ann Blanchard was directed by MCF-Faribault's administration to investigate alleged wrongdoing by Piepho. (Ex. E14 at 26199.) The underlying allegations were that Piepho was engaging in workplace assignments which she did not have the authority or permission to undertake. (*Id.*)

As background, by the time of this investigation, Piepho had been stripped of her Special Duty Coordinator title and specifically instructed to not participate, in any way, in the offsite appointment approval and scheduling process. (*Id.* at 26201.) Piepho had been replaced by her once junior, Ms. Ouellette.

Mses. Caffes, Thompson and Ouellette described a bizarre incident where Piepho was caught apparently attempting to sabotage her replacement's job performance. (*Id.*) Despite numerous warnings not to participate in the process, Piepho nevertheless took an offsite appointment order, cancelled the pending appointment, and did not document or otherwise communicate the cancellation. (*Id.* at 26201–02.) This phantom cancellation created confusion across the MDOC and Centurion as to the inmate's future care. (*Id.*) When asked whether she was involved, Piepho responded "no." (*Id.* at 26202.) However, when shown clear evidence to the contrary, Piepho admitted she "had worked on that appointment." (*Id.*) Piepho had wrote three weeks later of the cancellation in the inmate's

26

medical chart. (*Id.*) When asked why, Piepho stated "people were wondering why there was no documentation." (*Id.*)

In one particularly bizarre detail from the whole affair, Ms. Caffes directly asked Piepho whether she was continuing to participate in the process. (*Id.* at 26206–08.) Piepho responded, lamenting the responsibility had been taken away from her. (*Id.* at 26208.) Piepho then **denied ever having any challenges** in the role, stating she was good at her job and **was never investigated** for failing discharge her professional duties. (*Id.*) Ms. Caffes explained "many of the challenges" that Piepho had with offsite appointment coordination. (*Id.*) In response, Piepho "became argumentative and defensive denying that there were any issues." (*Id.*)

In July 2018, Piepho received a one-day vacation-benefits reduction for violating her position description. (Ex. 15 at 26052.)

### D.    Allen's failed follow-up treatment

#### 1.    December 3, 2017: Allen's initial injury and appointment

On December 3, 2017, Allen fell while climbing out of his bunk and shattered his right hand against a desk. Allen's injury necessitated emergency care and accordingly, did not implicate MCF-Faribault's offsite appointment approval and scheduling process. (Ex. A1 at 2354 (12/3 note), 2481 (ER Form).) Allen was transported to DOH, where an x-ray showed "mildly comminuted fractures of the third and fourth metacarpals distally." (*Id.* at 2473.) Swelling of the area was significant, so Allen would need to return for his broken to be (surgically or otherwise) set and cast. (*Id.* at 2484–89.) Allen's hand was immobilized in a splint and he was ordered to return in three days. (*Id.* at 2484.)

27

**2.      Scheduling Allen's first follow-up appointment**

Allen was checked in at MCF-Faribault on December 3 by a nurse who wrote the diagnosis and treatment plan in Allen's progress notes. (*Id.* at 2354 (12/3 note).) The next notation in Allen's progress notes was from Piepho: "Request to Centurion for urgent FU Fx R D Metacarpal." (*Id.* at 2354 (12/4 note); Ex. C1 at 14:9–17:24.) The packet—now containing the December 3 dictation and Allen's progress notes—was provided to Dr. Shaman, an onsite provider. He reviewed it, noting in Allen's progress notes and a Centurion Form the diagnosis, treatment plan and follow-up appointment order. (Ex. A1 at 2343 (12/4 note), 2483–89 (signed dictation), 2343 (12/4 Centurion Form).) Piepho received the packet from Dr. Shaman, scanning and saving the materials to an OSSLEF in the OSS Log. (*Id.* at 2354 (12/4 note); Ex. B1, 12/6 OSSLEF at 2610.)

**3.      Allen's December 6 appointment**

At the December 6 appointment with Dr. Armitage, Allen's hand was still too swollen to properly set and cast. (Ex. A1 at 2469–72.) Dr. Armitage thus ordered Allen to "remain in the splint for another 2 weeks and then if the swelling is down and the fracture is in place, we will cast at the next visit." (*Id.* at 2470, 2476.)

**4.      The follow up treatment never occurs**

On December 6, Allen was checked back into MCF-Faribault by Defendant Charles Brooks ("Brooks"). (Ex. A1 at 2354 (12/6 note); Ex. C2 at 27:10–31:8.) Brooks wrote in Allen's progress notes: "Returned from Dr. Armitage – ortho f/u. Consult completed 2 wk f/u, Ø use R hand except meds … Packet out for Provider review." (Ex. A1 at 2354; Ex. C2 at 27:10–31:8.) The packet was then reviewed by Piepho. She

28

noted: "Seen by Dr. Armitage for ortho FU. Dictation returned. Will put out for MD to review." (Ex. A1 at 2354; Ex. C1 at 30:2–31:10.) That information was pulled by Piepho from the dictation directly; her review is evident by her highlighting of Allen's name, the appointment's date and Dr. Armitage's treatment plan. (Ex. A1 at 2469–72.)

There is no evidence the packet was ever actually put out for a provider's review. If it was, there is no evidence which provider was provided the packet. Piepho did not include as much in Allen's progress notes. (*Id.* at 2354.) Further, there is no evidence that, if the packet was ever even put out, Piepho ever followed up with any provider. As Dr. Shaman later wrote, "Apparently, [Dr. Armitage's] consultation was not seen." (Ex. A1 at 2337.)

### 5.    December 6, 2017 to January 23, 2018:  Piepho

On December 22, a Centurion Form was created by Dr. Fontaine. (Ex. A1 at 2468; Ex. C4 at 59:14–60:4.) This event was not triggered by Piepho following up with an onsite provider or any type of oversight. Instead, it was because Allen signed up for sick call to ask if he was ever being sent back to see Dr. Armitage. (Ex. C5, Allen Dep. 151:6–153:21.)

Dr. Fontaine wrote that Allen was "last seen here 12-4-17 and referred to ortho. Seen by orthopedics 12-6-17, splinted, with request to return for casting in 2 weeks." (Ex. A1 at 2468.) Despite Dr. Armitage ordering the follow-up to occur within two weeks, Dr. Fontaine checked the Centurion Form's "urgent" box—a contractual term meaning the underlying provider ordered the appointment to occur within two days. (*Id.* at 2468; Ex. C4 at 59:14–60:4; Ex. K2 at ¶ 29.2.1.) Piepho did not even *begin* processing

the request until December 26. (Ex. A1 at 2479 ("Received by me 12-26-2017").)

Piepho maintains Rita Iverson, a UM nurse with Centurion, contacted her and ordered Allen's appointment priority status to be changed from urgent to "priority–within two weeks." (*See* Ex. A1 at 2479, 2354 (12/26 note), 2448 (Piepho's Post-It note), 2680 (12/22 Centurion Form); Ex. B2 at 2621 ("[C]hanged to priority within two weeks…"); Ex. C1 at 37:21–32:9, 44:15–21.) As a result, it was Piepho who slashed out "urgent" and circled "priority" on the Centurion Form. (*See* Ex. A1 at 2680; Ex. C1 at 37:21–38:9, 44:15–21.) On December 27, Allen's appointment was finally scheduled. He would see Dr. Armitage on January 23, 2018, over six weeks from December 6.

### 6.    The second follow-up appointment

On January 23, On January 23, Dr. Armitage noted that Allen was "suppose to come in in December for casting but did not" and that he could not close his hand. (Ex. A2 at Allen-017.) He recommended a hand specialist and occupational therapy. . (*Id.* at 018.) Allen's outcome was not in line with what Dr. Armitage would normally expect. (Ex. J2 at 5.).

### 7.    Allen returns to MCF-Faribault

On January 23, an MDOC nurse checked Allen back into the facility, noting in Allen's progress notes: "Returned from Special Duty … forwarded to M. Caffes HSA for F/u." (Ex. A1 at 2353 (1/23 note).) Two hours later, Ms. Caffes noted she had spoken to Dr. Armitage. (*Id.* at 2353 (1/23 note).)

The next day Piepho noted: "Dictation & treatment plan back from Allina + Dr. Armitage 1-23-18 appt. Out to Gene K. per supv to request off site. Off-site request

30

submitted but dictation not signed by our PA. Back out today for signature." (*Id.* at 2353 (1/23 note).)

### E.    Process Delays

The 150 non-party medical files obtained in discovery reveal countless examples of unexplained delays in offsite care. The delays canvassed below are a fraction of those located by Allen's counsel.

### 1.    Offender-1

Offender-1 had a stroke in June 2016. (Ex. L1 at 14383.) He was transported to DOH following a possible seizure on April 6, 2017. (*Id.*) While being evaluated, Offender-1 displayed "severe expressive and receptive aphasia as well as moderate oral apraxia," or, in other words, "**inability to answer moderately complex yes/no questions, complete rote speech, tasks, name common objects, and repeat multisyllabic words**." (*Id.* at 14371.) Accordingly, Offender-1 was ordered to undergo speech pathology treatment. (*Id.*)

On April 11, P.A. Kliber created a Centurion Form for an initial appointment with Dr. Patti McCool ("Dr. McCool"). (*Id.* at 14344.) The form was not submitted through the OSS Log by Piepho for seven days. (*Id.* at 14308 (4/18 note), 14344 (approved by Centurion).)

At the May 9 appointment, Dr. McCool ordered weekly therapy sessions for four consecutive weeks. (*Id.* at 14337–41.) Dr. McCool's order was not seen until May 24, when P.A. Kliber happened on it while treating Offender-1 for a skin issue. (*Id.* at 14300 (5/24 note), 14308 (gap in notes between 5/3 and 5/22).) Offender-1 would return to

31

Dr. McCool on June 13, *six weeks* after his initial appointment. (*See id.* at 14334.)

Dr. McCool noted at the follow up:

> Patient became very **teary-eyed** in the session due to his frustration at his inability to communicate. He stated that he felt his speech was worse now than during his previous episode of speech therapy. He stated that he can't talk to anyone at the correction facility due to not trusting them. **He only talks to his 2 daughters on the phone**. When asked if he still wanted to continue with this speech therapy, he indicated that he did not want to continue due to frustration level.

(*Id.*) As a result, Dr. McCool directed all appointments to be discontinued. (*Id.*) However, her order was never seen and thus Offender-1 was sent back on June 22. (*Id.* at 14324–31.) Once again, Dr. McCool ordered all appointments cancelled. (*Id.* at 14325.) Five days later, Piepho wrote: "All speech therapy appointments have been cancelled per P.A. Kliber." (*Id.* at 14305.)

At end, the six-week delay altered Offender-1's prognosis from "Patient is benefitting from skilled speech therapy and is making steady progress toward functional goals" to "The patient is not making progress with therapy goals." (*Id.* at 14325, 14327.)

### 2.    Offender-5

On January 18, 2017, Offender-5 presented to P.A. Kliber complaining of swelling over the left parotid gland. (Ex. L2 at 14581.) P.A. Kliber ordered x-rays, which were conducted on January 19. (*Id.* at 14581, 14590 (1/19 note).) The images were apparently never provided to an onsite provider. (*Id.* at 14581, 14590 (gap in the notes).) Nearly three months later, on May 4, Offender-5 presented to P.A. Kliber complaining of the same issue. (*See id.* at 14581 (5/4 note).)

At an offsite appointment on June 20, Offender-5 was diagnosed with lymphoma.

32

(*See id.* at 14654–58.) The dictation was faxed to "Sheryl" on June 22 with a note that "Per Dr. Ondrey: patient should consult with hematology + oncology in next 1-2 weeks." (*See id.* at 14655 (cleaned up).) The fax instructed that "a scheduler will contact you within the next 3 business days to assist you in setting up this appointment." (*See id.* at 14649.) The follow up went unscheduled for weeks. On July 12, HealthPartners Oncology & Hematology sent a letter stating:

> This letter is regarding a Consultation to Hematology/Oncology… . **We have not been able to reach you by phone to schedule an appointment for you**.

(*Id.* at 14628.) The same day, Piepho wrote in Offender-5's progress notes, "Request to Centurion for Hematology + Oncology." (*Id.* at 14590 (?).) However, the order was not submitted through the OSS Log for another six days. (*Id.* at 14590 (note), 14646 (Centurion Form).)

The appointment eventually occurred on July 31 (25 to 32 days late). (*See id.* at 14641–45.) At the appointment, Offender-5 was pre-scheduled for CT scans on August 11 and a follow up with oncology on August 28. (*Id.* at 14642–43.) Further process errors led the scans to occur on August 14 (three days late), and the follow up to occur on September 20 (three-plus weeks late). (*Id.* at 14632 (8/14 dictation), 14622–23 (9/20 dictation).)

### 3. Offender-6

On January 12, 2017, Offender-6's atypical aflutter ablation was addressed at a cardiology appointment with Dr. Jim Newton ("Dr. Newton"). (Ex. L3 at 14759–802.) Dr. Newton ordered a cardioversion in one-to-two weeks and a transthoracic

echocardiogram in four-to-six weeks. (*Id.* at 14802.)

There is no record of anyone seeing Dr. Newton's orders until January 17. (*Id.* at 14718.) The next day, Piepho submitted the cardioversion order through the OSS Log. (*Id.* at 14725.) The cardioversion was scheduled on January 20, at which point the first available appointment was on February 7, 12-to-18 days late. (2016-17 Spreadsheet.)[1]

The echocardiogram was not submitted by an onsite provider until February 3. (*Id.* at 14754.) Piepho submitted the order through the OSS Log on February 8. (*Id.* at 14724.) The appointment was scheduled for March 17, 22-to-36 days late. (*Id.* at 14747–52.)

On March 29, Offender-6's heart monitor notified he had converted back into aflutter and needed care. (*Id.* at 14756.) That need went undetected for *months*, until Offender-6 happened to present to P.A. Kliber complaining of an elbow injury. (*Id.* at 14715.) On June 20, P.A. Kliber wrote Offender-6 "was seen by the cardiologist in January at which time, they ordered an echo which was done, I believe three months later. We do not have the results of this in the chart. Patient states he has not had an ICD check since. So I certainly have to submit him for in-house check." (*Id.*) The next day, Piepho submitted the order through the OSS Log. (*Id.* at 14721.) The appointment ultimately occurred on June 28, three months after the monitor alert. (*Id.* at 14755.)

### 4.    Offender-7

On June 20, 2017, Offender-7 presented to Dr. Shaman complaining of a headache

---

[1]    The 2016-17 spreadsheet, DEF003148, was conventionally filed on 9/4/25 as Exbibit L to Moccio's Declaration (Dckt. #155).

that had lasted for six days and was causing blurred vision, nausea and vomiting. (Ex. L4 at 14805.) Dr. Shaman ordered an MRI and consultation with neurology. (*Id.* at 14821 (Centurion Form).) Inexplicably, Piepho did not submit the requisite materials through the OSS Log until August 14. (*Id.* at 14808.) The MRI was ultimately scheduled for August 25, eight weeks after it was initially ordered. (*Id.* at 14813.)

### 5.    Offender-9

In June 2017, Offender-9 was playing basketball when he came down wrong, his knee to buckle outward and he collapsed with a laterally dislocated knee cap. (*Id.* at 14879 (7/11 note).) Although the prison's nursing re-connected the kneecap, Offender-9 re-dislocated it when attempting to put any weight on the leg. (*Id.*) Offender-9 was then placed in a knee brace and provided crutches and a wheelchair. (*Id.* at 14880.) On July 11, Dr. Lorbieki evaluated the injury, determined Offender-9 had most likely suffered a torn ACL and ordered an MRI of the affected area. (*Id.* at 14879.)

The order was not seen for weeks, until July 27, when Piepho entered it to the OSS Log. (*Id.* at 14883 (6/27 note).) The movement towards the ordered treatment was because, on July 25, Offender-9 was wheeling himself down a hallway when he saw Dr. Shaman and asked about possible treatments for his ongoing knee pain. (*Id.* at 14878.) For some unexplained reason, the MRI did not actually occur until October 13, more than three months after it was initially ordered. (*Id.* at 14908.) The scan revealed a "mild grade 1/2 sprain of the ALC." (*Id.* at 14908.)

### 6.    Offender-13

On July 5, 2017, Offender-13 was ordered to return to an offsite ophthalmologist

35

within one month for further treatment of his glaucoma secondary to eye trauma. (Ex. L6 at 15094.) The next day, on July 6, Piepho wrote in the progress notes: "Dictation back & out for MD to review." (*Id.* at 15109.) An onsite provider did not approve the order until one week later. (*Id.* at 15092 (Centurion Form).) Piepho did not to submit the onsite provider's approval through the OSS Log for two more weeks. (*Id.* at 15092 ("Sub 7-27-2017"), 15109 (6/27 note).) Centurion's schedulers reached out that same day, but the soonest available appointment was August 14, 12 days late. (*Id.* at 15092.)

### 7.    Offender-31

The medical file of Offender-31 speaks for itself. He was diagnosed with high grade prostate cancer in October 2016. (Ex. L7A at 15888.) Shortly thereafter, the specialists treating Offender-31 became concerned he may also have lung cancer. (*Id.* at 15887.) In March 2017, eight months later, Kurt C. Demel ("Dr. Demel") of Regions Hospital summarized that "Much of [Offender-31's] care has been fragmented" and subject to "significant time delays" because "coordination of care has been difficult in the incarcerated state." (*Id.* at 15888.) As of March 2017, Offender-31 had "not been completely staged." (*Id.*) Although Dr. Demel and some colleagues would have liked some additional scans of the affected areas, Dr. Demel believed "coordination would just delay more definitive treatment that we all just really want to lust get started on." (*Id.* at 15891.)

### 8.    Offender-74

Offender-74 had an autoimmune disease where his body produced elevated levels of anti-monoamine oxidase antibodies. (Ex. L8A at 19535.) His onsite providers and

offsite specialists treated began treating the condition with Rituximab injections every 10 weeks. (*Id.*) Rituximab is highly dangerous on its own, with prolonged or over exposure being potentially lethal, and when mixed with any other chemotherapy. (*See id.* at 19572, 19597.) Rituximab is potentially lethal when mixed with **cyanocobalamin**. (*See id.* at 19527.)

In 2017, Offender-74's treating physicians began to ween his dependence on Rituximab. On March 15, Dr. Jeffrey A. Allen ("Dr. Allen") at the University of Minnesota ordered injections occur every 12, instead of 10, weeks. (*Id.* at 19572, 19597.) The next injections were pre-scheduled for June 7 and August 30. (*Id.* at 19578, 19592.) On July 31, after the June 7 injection, Dr. Felt found Rituximab treatment had cratered Offender-74's b-cell count, thus ordering monthly **cyanocobalamin** injections and the cessation of all Rituximab treatments. (*Id.* at 19508.) Dr. Felt again noted as much on August 14. (*Id.*)

On June 28, Piepho reached out to Centurion to ask whether separate Centurion Forms needed to be submitted for the June 7 and August 30 injections. (*Id.* at 19540.) The answer was yes. (*Id.*) However, that e-mail also contains a handwritten note that Dr. Felt had specifically reached out to say that *no appointment should be scheduled* given Offender-74's B-cell count. (*Id.*)

On August 23, MCF-Faribault received a fax from the University of Minnesota reminding the next Rituximab injection was on August 30. (*Id.* at 19534.) Even though Dr. Felt had directly warned Piepho to cease all Rituximab treatments, she bafflingly submitted a Centurion Form for the August 30 injection. (Ex. L8B at 25795 (8/23 note).)

The appointment cleared UM review; Dr. Felt was not consulted. (Ex. L8A at 19530.) On August 30, Offender-74 was transported to his appointment with Dr. Allen. (*Id.* at 19523–27.) It is unclear how, but Dr. Allen caught the mistake. As he explained, "The combination of rituximab and **certolizumab** puts [Offender-74] at risk for serious and potentially life-threatening infection." (*Id.* at 19527.) The injection was thus aborted. (*Id.*)

### 9.    Offender-81

On April 28, 2017, Dr. Mark Hansen ordered Offender-81 to undergo glaucoma surgery. (Ex. L9 at 20025.) Surgery was pre-scheduled for June 22. (*Id.* at 19989.) The order went unseen until May 3, when Dr. Taylor (MCF-Faribault's onsite ophthalmologist) created a Centurion Form. (*Id.* at 19930 (gap in notes), 19969 (Centurion Form).) The form was not submitted by Piepho through the OSS Log until May 12. (*Id.* at 19930 (5/12 note), 19969 (Centurion Form).) Although the appointment was approved and scheduled on May 12, the first available appointment was on June 23, one day late. (*Id.* at 19969 (Centurion Form).)

Between the April 28 appointment with Dr. Hansen and the June 23 glaucoma surgery, Dr. William J. Lipham ("Dr. Lipham") diagnosed Offender-81's ongoing severe eye pain with mucus and bloody discharge was caused by a fracture of the orbital floor. (*Id.* at 20008.) On May 17, Dr. Lipham ordered the fracture to be surgically repaired before any glaucoma surgery could proceed. (*Id.*) The order for the fracture surgery was never submitted by Piepho to Dr. Taylor. (*See* at 19915 (Dr. Shaman directing the order be provided to Dr. Taylor).)

On June 7, Dr. Taylor was cleaning blood and mucus from Offender-81's eye

38

when she called Drs. Hansen and Lipham to "determine when they want to see him." (*Id.* at 19945.) Only then did Dr. Taylor learn Offender-81 needed to have the orbital fracture repaired before any glaucoma surgery could proceed. (*Id.* at 20005.) That same day, on June 7, Dr. Taylor created a Centurion Form approving the fracture surgery. (*Id.* at 20022.) Piepho did not see Dr. Taylor's approval *for weeks*. On June 20, Piepho submitted Dr. Taylor's Centurion Form through the OSS Log with a handwritten note that the form "was left in Dr. Taylor's mailbox, returned to me 6-20-17." (*Id.* at 20022 (Centurion Form), 19930 (gap in notes).)

At end, the fracture surgery was slotted for June 23—the date set for the glaucoma surgery—and the glaucoma surgery was moved to July 17—more than three weeks after it was ordered to occur. (*Id.* at 19962.)

### 10.    Offender-86

In October 2016, Offender-86 was ordered to have a colonoscopy between January 25 and February 25, 2017. (Ex. L10 at 20265.) The order was not seen until a routine onsite checkup with Dr. Felt on February 28, at which point the colonoscopy was approved. (*Id.* at 20266 (2/28 note), 20271–72 (gap in notes).) Dr. Felt's approval was apparently never seen. (*Id.* at 20271–72 (gap in notes).) Offender-86 was next treated at a routine onsite checkup with Dr. Fontaine on March 16, who also approved the follow-up. (*Id.* at 20265 (3/16 note), 20274 (Centurion Form).) The next day, Piepho submitted Dr. Fontaine's Centurion Form through the OSS Log. (*Id.* at 20274 (3/17 note), 20274 (Centurion Form).) Centurion approved and scheduled the appointment that same day, at which time the earliest available appointment was on April 11, months late. (*Id.* at

39

20274.)

### 11. Offender-89

Offender-89 had a history of head and neck injuries that preceded him sustaining numerous blows to the head and neck in a December 2016 assault. (Ex. L11 at 20327 (1/23 and 3/20 notes).) On January 23, 2017, Dr. Felt diagnosed Offender-89 with a whiplash-like injury and ordered an x-ray of the area. (*Id.* at 20327.) Apparently, that order was not seen for months. (*Id.* at 20331–33.) An x-ray did not occur until April 11. (*Id.* at 20331 (4/11 note).)

On April 12, Dr. Shaman treated Offender-89 and ordered a CT scan of the injury. (*Id.* at 20326 (note).) The order was submitted by Piepho through the OSS Log on April 13. (*Id.* at 20331 (note).) The April 27 scan revealed a fracture in Offender-89's left orbital floor. (*Id.* at 20338.) The unexplained process errors in scheduling Offender-89's treatment delayed appropriately diagnosing his injury by *months*. In the interim, Offender-89—who had a history of narcotic abuse—was having his ongoing pain treated with prescription narcotics. The final note produced from his medical file is a treating professional addressing the concern around whether the provision of painkillers had been creating further addiction issues for Offender-89. (*Id.* at 20322.)

### 12. Offender-97

On May 31, Offender-97 was treated by Dr. William Hession ("Dr. Hession") at the Minneapolis Heart Institute for left chest discomfort radiating into the neck. (Ex. L12 at 20680–91.) Dr. Hession ordered Offender-97 to wear a heart monitor for two weeks then follow up for the results. (*Id.* at 20685.)

Dr. Hession entered his report from the May 31 appointment on June 2. (*Id.* at 20692.) Piepho did not request the dictation until 12:08 P.M. on July 6. (*Id.* at 20692.) The dictation was faxed to Piepho *fourteen* minutes later. (*Id.*) Piepho then wrote in Offender-97's progress notes: "Seen by Dr. Hession for cardio consult. Dictation back & out for MD to review." (*Id.* at 20721.)

An onsite provider did not review the dictation until July 12, when Dr. Lorbieki evaluated Offender-97, writing Offender-97 "was somewhat disappointed" he was not contacted for a heart monitor but the order would now be approved. (*Id.* at 20714.)

The gap in Offender-97's progress notes between July 12 and August 13, followed by Ms. Caffes's entry of the Centurion Form through the OSS Log, suggests the offsite appointment order was part of the initial backlog of offsite appointments that was discussed in the October 2017 disciplinary investigation. (*Id.* at 20721.) By the time the monitor fitting was scheduled, Offender-97 could not be seen until September 12, more than three months after the initial request was placed. (*Id.* at 20671–75.)

### 13.    Offender-101

On September 6, 2017, Offender-101 was admitted to Abbott Northwestern Hospital for heart palpitations, nausea, chest pressure, and lightheadedness. (Ex. L13 at 21100.) He was fitted with a heart monitoring device and ordered to follow up within 30 days at Minneapolis Heart Institute. (*Id.* at 21122, 21128.)

After being discharged on September 7, Piepho wrote in Offender-101's progress notes: "9:20 A.M. Dictation from ER obtained Out for MD review." (*Id.* at 21034.) The next morning, on September 8, Dr. Fontaine evaluated Offender-101, writing "We will

41

get the records from Abbott Northwestern, have the nursing staff be aware of the Holter monitoring and have him follow up appropriately to complete the Holter monitoring study." (*Id.* at 21006.) Apparently, the dictation from Offender-101's hospital stay did not make its way to Dr. Fontaine.

The follow-up order was not seen until September 15, when Dr. Fontaine further evaluated Offender-101, writing: "Referral written as requested by Cardiology… 'please follow up within 30 days with Cardiology.'" (*Id.* at 21007.) Defendants, however, did not produce any record of that Centurion Form. There is also a gap in his progress notes in this period, suggesting any Centurion Form was lost.

On September 18, Offender-101 was again rushed to the hospital. He was again ordered to follow up "As planned in 1-2 weeks." (*Id.* at 21135.) Of course, no appointment had been submitted to Centurion or scheduled. On September 19, the Minneapolis Heart Institute called MCF-Faribault, asking whether an appointment was being scheduled. (*Id.* at 21033.) That same day, another Centurion Form was created. On September 20, Piepho wrote in Offender-101's progress notes "Request to Centurion for Cardio." (*Id.* at 21032.)

Centurion promptly approved and scheduled the appointment. Nevertheless, by that time, Minneapolis Heart Institute did not have any openings until October 27, 2017, more than 20 days late. Dr. Fontaine specifically asked Piepho to see if Centurion could get the appointment moved up. (*Id.* at 21121.) Centurion could not. (*Id.*)

### 14.    Offender-119

Offender-119's right elbow was surgically repaired with a metal plate prior to his

incarceration. Sometime in 2017 while incarcerated at MCF-Faribault, the plate broke in a manner that was pulling at the bone and grating against the ulnar nerve, causing pain around 7/10 at base and over 10/10 intermittently. (Ex. L14 at 22457.) On August 7, Dr. Hans C. Bengtson ("Dr. Bengtson") at Summit Orthopedics ordered Offender-119 to see a trauma specialist. (*Id.*) On August 8, Piepho wrote in Offender-119's progress notes, "Ortho consult done. No report returned. Awaiting dictation." (*Id.* at 22398.) There was no movement toward a follow-up appointment until, on August 21, Offender-119 asked a nurse for ice, ibuprofen, and whether he should expect any follow-up care for his ongoing elbow pain. (*Id.* at 22397.) A few days later, Piepho contacted Summit Orthopedics for Offender-119's dictation. Dr. Bengtson had filed the dictation on August 7, meaning it was ready at the time of Piepho's August 8 note. (*Id.* at 22456–57.) The ordered follow-up appointment with a trauma specialist was submitted on August 28. (2016-17 Spreadsheet.) Offender-119 was finally able to see a trauma specialists on September 25, at which time he was ordered to immediately undergo surgery "due to the ulnar nerve symptoms." (*Id.* at 22453.)

## ANALYSIS

### I.    Standard of Review

A court may grant a party's motion for summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A party opposing summary judgment "'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v.*

*Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256–57 (1986)). The question is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. A party "may not merely

point to unsupported self-serving allegations, but must substantiate allegations with

sufficient probative evidence that would permit a finding in [their] favor." *Davidson &*

*Associates v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005); *see also Conolly v. Clark*, 457

F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is

not defeated by self-serving affidavits.").

## II.    Deliberate Indifference

Piepho's liability under the Cruel and Unusual Punishments Clause of the Eighth

Amendment depends on two elements. First, Allen must demonstrate he had an

objectively serious medical need. *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).

Second, Piepho must have subjectively knew of, but deliberately disregarded, Allen's

serious medical need. *Id.*

### A.    The objective element

An objectively serious medical need is "one that has been diagnosed by a

physician as requiring treatment." *Davis v. Buchanan Cnty.*, 11 F.4th 604, 623–24 (8th

Cir. 2021). Allen's broken hand and necessary treatment were diagnosed by numerous

doctors. (Ex. A1 at 2343, 2470, 2473, 2475.) *See Bryan v. Endell*, 141 F.3d 1290, 1291

(8th Cir. 1998) ("There is no doubt that the plaintiff had a serious medical need. His hand

had been broken."); *Presson v. Reed*, 65 F.4th 357, 366–67 (8th Cir. 2023)

44

(distinguishing a delay in and withholding of necessary treatment).

### B.      The subjective element

As a subjective standard, deliberate indifference falls "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). An Eighth Amendment claimant need not show an official believed her acts or omissions would cause harm, but must demonstrate "more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 835. The something "more" is provided when an official's acts or omissions are not reasonably calculated to abate a known or obvious substantial risk of harm. *Kahle v. Leonard*, 477 F.3d 544, 552 (8th Cir. 2007). In effect, the only difference between ordinary negligence and deliberate indifference—which is commonly analogized with criminal recklessness— is knowledge of the risk. *Farmer*, 511 U.S. at 837.

The Eighth Amendment's subjective element thus turns on whether an official: (1) was aware of facts from which she could infer an inmate was being exposed to a substantial risk of serious harm; (2) had actual knowledge of the risk; and (3) disregarded the known or obvious risk by failing to take reasonable measures to abate it. *Id.* at 837; *Schaub*, 638 F.3d at 914–16. These are factual inquiries "subject to demonstration in the usual ways." *Farmer*, 511 U.S. at 842. Accordingly, a defendant's knowledge of the risk may be established on direct evidence or inferred from circumstantial evidence, and the second sub-element may be presumed—as established below—from a risk's obviousness. *Id.* at 842–42.

In appraising the risk posed to an inmate, "it does not matter whether the risk

45

comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843; *see, e.g.*, *Makdessi v. Fields*, 789 F.3d 126, 139 (4th Cir. 2015) ("The court will be able to determine, in light of Makdessi's undisputed vulnerability …, if the risk of serious harm to Makdessi in housing him with an aggressive gang member who had committed numerous assaults while imprisoned was so obvious that the Defendants must have known of the risk, appreciated its seriousness, and yet failed to take reasonable measures to abate it."); *Hernandez v. Covello*, Civ. No. 21-1948, 2024 WL 1484047, at *1 (E.D. Cal. Apr. 4, 2024) ("Covello was personally made aware of plaintiff's medical history and high risk of injury to COVID-19 …. Thus, plaintiff is not merely alleging that defendant is responsible for an administrative determination or for failure to supervise.").

Here, Allen was posed risks from *multiple* sources, one for reasons personal to him and another because all prisoners in his situation faced such a risk. There was a substantial risk of serious harm *specifically* posed to Allen by the nature of his individual injury. *See, e.g.*, *Miller v. Schoenen*, 75 F.3d 1305, 1310–11 (8th Cir. 1996). Piepho knew the exact bones that Allen broke, that Dr. Armitage was having trouble casting Allen's hand due to injury-related swelling, and that Allen was ordered to return within two weeks for further care. *See Schaub*, 638 F.3d at 916 (finding subjective knowledge from VonWald's exposure to a letter documenting Schaub's conditions); *see also Coleman v. Rahija*, 114 F.3d 778, 786 (8th Cir. 1997) (finding subjective knowledge from Rahija's exposure to records documenting Coleman's medical history).

Allen also faced a substantial risk of serious harm from that *generally* posed to MCF-Faribault inmates in need of offsite care by the offsite appointment approval and scheduling process and Piepho's failure to track and maintain the offsite orders through the completion of the process. *See DeGidio v. Pung*, 704 F. Supp. 922, 955–56 (D. Minn. 1989) (Murphy, J.) (citing *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987) (citing *Todaro*, 565 F.2d at 53)).

Piepho was the sole MCF-Faribault employee specifically tasked with overseeing the facility's offsite appointment approval and scheduling process. Just a sample of Piepho's tenure as Special Duty Coordinator demonstrates she was abundantly aware of, if not directly responsible for, how the "grossly inefficient" process failed *hundreds* of inmates (that Allen knows about). She received numerous negative performance reviews for failing to track and maintain the timely approval and scheduling of offsite appointments and was placed on multiple PIPs urging she correct her behavior. She was warned weekly, if not daily, over 2017 by MCF-Faribault's administration that failing to track and maintain the offsite appointment approval and scheduling process risked the health of inmates. She was investigated and disciplined numerous times from 2015 to 2018, including *just 19 days* prior to untimely processing Dr. Armitage's December 6 offsite appointment order. Each investigation presented a staggering amount of evidence that failing to track and maintain offsite appointments risked seriously harming inmates. As a result, Piepho presumptively knew that failing to track and maintain the timely approval and scheduling of offsite appointment orders substantially risked delaying or

47

effectively denying access to necessary medical care. *DeGidio v. Pung*, 920 F.2d 525, 531–33 (8th Cir. 1990) (applying pervasive risk standard); *Vandevender v. Sass*, 970 F.3d 972, 976–77 (8th Cir. 2020) (the same).

Piepho's acts and omissions were not reasonably calculated to abate the risk at issue. Allen presents direct evidence that Piepho was *purposefully* disregarding the serious medical needs of MCF-Faribault's inmates. Piepho's deliberate disregard is further established by her: (1) refusal to adopt or hew to procedures that she knew would mitigate the risk of time-sensitive appointments being untimely approved and scheduled; (2) failure to timely process *hundreds* of offsite orders despite countless warnings that failing to track and maintain the offsite process endangered inmates; and (3) refusal to ever take accountability for the delays in the approval and scheduling of offsite appointments. *DeGidio*, 704 F. Supp. at 954–58; *Kahle*, 477 F.3d at 551–52; *De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 803 (8th Cir. 2022).

### 1.    The specific risk

The evidence clearly and irrefutably establishes Allen's serious medical need was obvious to Piepho. *See Schaub*, 638 F.3d at 915–16; *Coleman*, 114 F.3d at 786; *Patterson v. Kelley*, 902 F.3d 845, 852–53 (8th Cir. 2018). As part of processing the follow-up order placed on December 3, 2017, Piepho reviewed Allen's appointment records and wrote in his progress notes: "Request to Centurion for urgent FU Fx R D Metacarpal." (Ex. A1 at 2354 (12/4).) Piepho testified her notation meant Allen had been diagnosed with a fracture of the right metacarpal, needed "urgent" medical care (meaning within two days of Dr. Armitage's order), and was ordered to receive offsite medical care.

48

(Ex. C1 at 17:7–17:24.) After Dr. Shaman approved the follow-up, Piepho submitted the packet to Centurion's central office through the OSS Log. (Ex. F1 at 1–3; Ex. C1 at 17:20–24 ("The request is the offender to see Centurion, and he would send me the paperwork for that and then I would, again, pull out the pertinent information and send it on to the approval committee and they would take it from there.").) Piepho entered into the "Procedure/Test area" of the December 6 OSSLEF: "Dr. Armitage / RU Fx 3rd and 4th right metacarpals - Urgent - Due B4 12/06/2017." (Ex. B2 at 2610; *see* Ex. F1 at 2–3 ("Enter information on Appointment Log in Medical Information – Procedure/Test area.").) Thus, as of December 4, Piepho expressly noted Allen's serious medical need. *Schaub*, 638 F.3d at 916; *see also Coleman*, 114 F.3d at 786.

Allen returned to MCF-Faribault on December 6 with the dictation from that morning's appointment. (Ex. A1 at 2354 (12/6); Ex. C1 at 30:2–32:19; Ex. C2 at 37:25–39:14.) Piepho went through the dictation, highlighted the important passages and pulled the important information into Allen's progress notes. (Ex. F1 at 2; *see* Ex. A1 at 2354 (12/6 note), 2469–2476 (12/6 dictation); Ex. C1 at 30:2–31:10.) Piepho then wrote in Allen's progress notes: "Seen by Dr. Armitage for ortho FU, Dictation returned. Will put out for MD to review." (Ex. A1 at 2354; Ex. C1 at 30:2–31:10.) On December 6, Piepho again expressly noted Allen's serious medical need. *Schaub*, 638 F.3d at 916; *see also Coleman*, 114 F.3d at 786.

In sum, Piepho expressly documented and was otherwise exposed to information expressly noting the exact bones that Allen broke, that Dr. Armitage was having trouble treating Allen's hand due to injury related swelling, and that Allen needed to return to

49

Dr. Armitage by December 20 so his hand could be properly set and cast. Thus, no reasonable jury could find that Allen's need for medical treatment was not obvious to Piepho. *Schaub*, 638 F.3d at 916; *see also Coleman*, 114 F.3d at 786.

## 2. The general risk

### a. Introduction

Allen was also posed a substantial risk of serious harm from MCF-Faribault's offsite appointment process and Piepho's continual failure to timely track and maintain offsite appointment orders through the process's completion. The risk was *general*, meaning it was not particularized to any specific inmate but posed across all MCF-Faribault inmates in need of offsite care. *Farmer*, 511 U.S. at 843 ("[I]t does not matter … whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."). General risks to inmate populations have included, as here, the delivery of health services, *DeGidio*, 704 F. Supp. at 954–58; *Todaro*, 565 F.2d at 52–53; *Wellman v. Faulkner*, 715 F.2d 269, 272–73 (7th Cir. 1983), as well as exposure to infectious maladies, *DeGidio*, 704 F. Supp. at 954–58, inmate attacks and sexual assaults, *Tafoya v. Salazar*, 516 F.3d 912, 917–18 (10th Cir. 2008); *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980); *Martin v. White*, 742 F.2d 469, 474–75 (8th Cir. 1984), and unsanitary food and water, *Ramos*, 639 F.2d at 570–72.

There are two ways a general risk may factor into the deliberate indifference standard. First, a general risk may itself pose a substantial threat of serious harm. *See, e.g.*, *DeGidio*, 920 F.2d at 533 (applying the pervasive risk standard); *Vandevender*, 970 F.3d at 977 (the same); *Porm v. White*, 762 F.2d 635, 636–38 (8th Cir. 1985) (finding a

50

food service worker was deliberately indifferent to a pervasive risk). Second, Piepho's knowledge and misadministration of MCF-Faribault's offsite process may be considered with her knowledge of Allen's specific injury when determining whether these collective circumstances were known or obvious and posed a substantial risk of serious harm. *See, e.g.*, *Farmer*, 511 U.S. at 830–31 ("[T]he complaint alleged that respondents … transferred petitioner to USP-Terre Haute … despite knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that petitioner, [a transgender woman], would be particularly vulnerable to sexual attack by some USP-Terre Haute inmates."); *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) ("The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing … and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result …. Petitioners … are 'incarcerated under conditions posing a substantial risk of serious harm.'" quoting *Farmer*, 511 U.S. at 834); *Hernandez*, 2024 WL 1484047, at *1.

There are two significant differences between establishing a known or obvious substantial risk through a general risk alone or as one variable in a set of circumstances. As an initial matter, the latter does not demand any additional showing. An official's knowledge of the general risk may be established as if it were any specific risk. All that must be shown is that the collective circumstances were known or obvious and, together, posed a substantial risk of serious injury. *Farmer*, 511 U.S. at 850; *Makdessi*, 789 F.3d at 139. In contrast, a general risk itself poses a substantial risk of serious harm when the

general risk is **pervasive**. *Martin*, 742 F.2d at 475 (inmate attacks); *DeGidio*, 920 F.2d at 532–33 (medical needs); *Glick v. Henderson*, 855 F.2d 536, 539–40 (8th Cir. 1988) (the same); *Vandevender*, 970 F.3d at 976–77 ("The Supreme Court in *Farmer* did not address at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.… Our cases both before and after *Farmer* have addressed the question. To establish defendants' deliberate indifference in failing to protect from assault by another inmate, Vandevender must show that he was faced with a pervasive risk of harm …." (cleaned up)).

Next, establishing a pervasive risk, *i.e.*, a general risk that itself posed a substantial risk of serious harm, eliminates any need to demonstrate a defendant-official thought the risk would come due in a specific manner or against a specific inmate. *Farmer*, 511 U.S. at 843–44 ("[I]t would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom."); *Hutto v. Finney*, 437 U.S. 678, 683–84 (1978) (exposing inmates to crowded cells where some had infectious diseases demonstrated deliberate indifference to the general risk of further infection, even without any knowledge of *which* inmates would be infected); *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005). Accordingly, the pervasiveness of the general risk posed by the offsite process—and Piepho's misadministration thereof—does not turn on Piepho's knowledge of Allen's specific injury but on the systems, procedures and history of delayed offsite care at MCF-Faribault. *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 926–27 (8th Cir. 2010) ("[I]t could be relevant whether *these officers* or their supervisors (not just Whitson) knew … a particular protocol is used to accommodate such transports, and whether such

protocol was actually followed that morning."); *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002) ("[P]laintiff's claim does not 'arise from' Pruett's attack *per se*, but arises from plaintiff's substantiated allegation that defendants were deliberately indifferent to a known substantial risk that such an attack would occur.").

### b. The pervasive risk

There are two factual variables in the pervasive risk standard—the number of past incidents and the relationship those incidents share with some system-wide deficiency.

Where there is no system-wide deficiency, a number of isolated incidents of medical malpractice or negligence do not establish a risk was pervasive. *DeGidio*, 920 F.2d at 532–33. However, pervasiveness is established on far less than proof that a facility succumbed to anarchy. *Vandevender*, 970 F.3d at 976–77; *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir. 1980) ("[D]efendants … contend that something approaching anarchy must be proven … but conditions need not deteriorate to that extent before the constitutional right to protection arises."). Incidents need only occur with sufficient frequency to reasonably apprise a prison official of the **existence of the problem** and **the need for protective measures**. *Vandevender*, 970 F.3d at 976–77; *Porm*, 762 F.2d at 637–38 (finding three-to-four inmate attacks sufficient).

Where there is some related system-wide deficiency, the number of incidents needed to presume an official's actual knowledge of the general risk dwindles. *Dulany v. Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997); *see Goka v. Bobbitt*, 862 F.2d 646, 651–52 (7th Cir. 1988) ("When prison officials are unaware of the risk involved and violate a policy which may have prevented injury to an inmate, courts have generally found no

constitutional violation …. A contrary result is reached, however, where defendants know of the danger or where the threat of violence is so substantial or pervasive that their knowledge could be inferred, and yet defendants fail to enforce a policy or take other reasonable steps which may have prevented the harm.").

If this framework seems familiar, it should. It is simply a fitting of *Canton*'s obviousness standard to whether a general risk was subjectively obvious to an individual officer, rather than objectively obvious to a municipality. *Farmer*, 511 U.S. at 840–44 (discussing differences and similarities of "deliberate indifference" in municipality and individual official contexts); *Berry v. City of Muskogee*, 900 F.2d 1489, 1495 (10th Cir. 1990) ("[A]n official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights."); *DeGidio*, 920 F.2d at 532 (endorsing then-District Judge Murphy's articulation of the deliberate indifference standard for individual officials as "within the standard enunciated in *Berry*."); *Whitson*, 602 F.3d at 926–27 (discussing how to demonstrate a general risk was known or obvious to non-supervisory and non-policy-making officers); *Choate v. Lockhart*, 7 F.3d 1370, 1374–76 (8th Cir. 1993) (demonstrating the same); *Patterson*, 902 F.3d at 852–53 (differentiating objectively and subjectively obvious risks; the latter requires "some evidence showing that the defendants were exposed to the underlying facts revealing that risk.").

### 1.    System-wide deficiency

The untimely provision of offsite medical treatment at MCF-Faribault was unquestionably related to the facility's offsite appointment approval and scheduling

process. *See Goka*, 862 F.2d at 651–52 (collecting cases on procedures that create risks of harm). The bad outcomes were not mistakes insofar as they were not one-offs. Incidents of delayed and denied care were a direct result of the "grossly inefficient" and "work intensive" offsite appointment approval and scheduling process. (*See* ex. H1 at p. 101.) The process was designed to have numerous layers of review. Each layer necessitated multiple handoffs and each handoff provided an opportunity for something to be lost or go unseen. The deficiencies in the process were apparent to everyone who came into contact with it. In fact, the MDOC knew about the deficiencies for *years* before Piepho failed to timely track and maintain the approval and scheduling of Allen's offsite appointment. *Prater v. Dahm*, 89 F.3d 538, 542 n.2 (8th Cir. 1996) ("Statements or actions by prison officials indicating they perceived a risk will also assist an inmate in establishing the subjective component of an Eighth Amendment violation.").

In February 2014, Minnesota's Office of the Legislative Auditor ("OLA") studied the "Health Services in State Correctional Facilities." (Ex. H1.) As part of reviewing the delivery of offsite care in the MDOC's facilities, the OLA obtained the 2010-to-2013 OSS Log. However, the MDOC's recordkeeping was so poor that most of the data was illogical and thus unusable. (*Id.* at 25 n.39.) The OLA was thus limited to analyzing entries from September 2012 to September 2013. (*Id.*) The sample revealed only **60 percent** of "urgent" appointments occurred within the timeframe indicated by the provider, and only **84 percent** of "non-urgent" appointments occurred within the ordered timeframe. (*Id.* at 26.)

The OLA's attempt to understand exactly why so many appointments were

55

untimely met the same issue as studying the overlying problem. A random sample of medical files revealed virtually no instances where an appointment's untimeliness was recorded. The appointment simply did not occur or did untimely. (*Id.* at 25–26.) The root of the problem, however, was clear. As summarized by the MDOC's contract manager, the offsite scheduling process was "**grossly inefficient, duplicative, and needlessly work intensive**" and had created a "**long-standing concern**" over the timeliness of offsite appointments. (*Id.* at 101.)

Two years later, in 2016, the MDOC studied the "Timeliness and Quality of Offsite Care." (Ex. H2, at 1.) According to the MDOC, untimely offsite care was the number one risk in "financial, operations, and injury categories" across its facilities. (*Id.*) The factor driving untimely offsite care with "highest likelihood of occurrence" was "**a delay in the process**—faxes lost, **multiple handoffs**, multiple calls, limited availability of decision makers." (*Id.* at 8–9.) The MDOC ascribed fault to its staff, explaining "The process error is the offender not coming back with paperwork or **the paperwork is lost** or the dictation was not received. All of these cause delays, or, in some cases **something isn't done because we aren't aware of an order** that was possibly given to the offender." (*Id.* at 8–10 (emphasis added).)

MCF-Faribault's staff who worked with the offsite process each drew the same inference—the offsite process presented a substantial risk to inmate health and thus demanded precautionary action. On arriving at MCF-Faribault, Ms. Caffes "observed" a "large number of problems with the timeliness of fully completing the offsite process." (Ex. E7 at 26080.) As she assessed, "if a better system does not get put in place, **it is a set**

**up for risky patient care and potential litigation**." (Ex. E11 at 26164.) Ms. Ohnstad similarly addressed the risk, declaring "continual errors" to be "**a tremendous liability**." (*Id.* at 26165.) Ms. Thompson provided similar comment, stating the "breakdowns due to an unreliable tracking system" were "**a high risk**" for jeopardizing inmate health. (*Id.* at 26164–65.)

The deficiency with the offsite process is relevant to Piepho in a simple and intuitive way. Workers know their workplace. So, if there is some workplace procedure that tends to create errors or bad outcomes, workers tend to know as much, especially when they are tasked with executing the haphazard and ill-conceived procedure. *See Prater*, 89 F.3d at 542 n.2; *Coleman*, 114 F.3d at 785–86 ("[A] substantial risk to the inmate's health was … expressly noted by prison officials in the past ….").

Here, the risks created by a multistep process that necessitates numerous handoffs of a paper file were, on the process's face, obvious. *See Goka*, 862 F.2d at 652 ("The risk to inmate safety from misuse of maintenance and other tools as weapons is evident on the face of the tool control policy."). Further, every official in the record looked at the offsite process and assessed it in quite possibly the most legally damning terms possible. The MDOC's contract manager—grossly inefficient, duplicative, needlessly work intensive and created a long-standing concern as to offsite care timeliness; Ms. Caffes—a set up for risky patient care and potential litigation; Ms. Ohnstad—a tremendous liability; Ms. Thompson—a high risk for jeopardizing inmate health. *Prater*, 89 F.3d at 541 n.2; *Coleman*, 114 F.3d at 785–86.

Piepho worked with the process for *years*. The professional duties in her position

description explicitly encompassed tracking and maintaining offsite orders through the process's completion, developing a system to achieve as much, and following up *daily* with the onsite providers to ensure offsite orders were being timely processed. Further, her professional duties made her integral to each of the handoffs that increased the risk that something would be lost and in turn, an inmate would receive delayed offsite care. As a result, it is particularly easy to presume that Piepho—like the OLA, the MDOC, its contract manager, Ms. Caffes, Ms. Thompson and Ms. Ohnstad—actually inferred the offsite process created a substantial risk of serious harm and thus demanded precautionary action.

## 2.    Instances of delay

The dangers presented by the offsite process and the misadministration thereof, as well as the need to take precautionary action to elide such dangers, were not, however, some abstract concept that Piepho needed to divine from structurally or deconstructurally considering the process. The scope and detail of the evidence going to the scienter element is staggering. Piepho was behind the delayed treatment of *hundreds* of inmates (that Allen knows about), and was doing all this while her supervisors were ordering, urging, begging her on a weekly, if not *daily*, basis to track and maintain offsite orders through the offsite process's competition.

The non-party medical records obtained in discovery are sickening. The fraction of incidents presented here clearly demonstrate Piepho observing, over and over *and over* again, how disregarding her professional duties inevitably endangered and immiserated inmates. *Porm*, 762 F.2d at 637–38 (finding that a handful of inmate fights qualified as a

pervasive risk of harm).

A speech pathology appointment delayed by *six weeks* led an inmate with no practical speaking ability to breakdown in tears and give up on ever getting better. (*Supra* I.E.1.) An inmate's lymphoma went undiagnosed for *months*. (*Supra* I.E.2.) Treatment for atypical aflutter ablation was delayed for *weeks*. (*Supra* I.E.3.) A headache lasting days went untreated for *eight weeks*. (*Supra* I.E.4.) An inmate with a blown-out knee, confined to a chair, awaited an MRI that was delayed by *three months*. (*Supra* I.E.5.) Necessary glaucoma treatment was delayed by *weeks*. (*Supra* I.E.6.) An inmate with high-grade prostate cancer received virtually no substantive care—and his lung cancer went undiagnosed—for *eight months* due to the failure to coordinate even his staging appointments. (*Supra* I.E.7.) An inmate nearly received a life-threatening injection because Piepho disregarded explicit instructions to cancel the appointment. (*Supra* I.E.8.) An orbital bone fracture discharging blood and mucus went untreated for *weeks*. (*Supra* I.E.9.) A colonoscopy was delayed by *months*, (*Supra* I.E.10.) Another orbital bone fracture went undiagnosed for *months*. (*Supra* I.E.11.) A heart monitor notifying of atypical aflutter ablation went unchecked for *months*. (*Supra* I.E.12.) An inmate with heart palpitations had treatment delayed by *weeks*, until he was rushed to the emergency room. (*Supra* I.E.13.) A broken surgical implant, causing extreme pain, did not receive necessary treatment for *months*. (*Supra* I.E.14.)

Piepho's disciplinary records further detail the sheer number of inmates left to suffer by Piepho's callous disregard for her professional duties. In December 2015, Ms. Thompson found **three appointments** that Piepho had failed to set out for an onsite

provider's review. (Ex. E4 at 26262, 26264.) In mid-2017, Ms. Caffes discovered **a backlog of offsite appointment orders** that Piepho failed to process and thus were never approved or scheduled. (Ex. E7 at 26080.) From June to September 2017, Ms. Caffes found **numerous instances** where Piepho's failure to track and maintain the offsite process led to delayed offsite care. (Ex. E7 at 26092–93 (## 6–8, 10).) In September 2017, Piepho told Centurion that she had yet to even begin processing **a *new* backlog** that totaled **70 offsite orders**; she denied the number was that large to Ms. Caffes, instead copping to being **40 offsite orders behind**. (Ex. E7 at 26081, 26083 (e-mails), 26093 (#11).)

Mses. Ouellette and Thompson were assigned to process the new backlog. They discovered even *more* untimely offsite orders, including **six** written in July and August that Piepho had begun processing but, as of September, had yet to be reviewed by an onsite provider. (Ex. E7 at 26081, 26093 (#12).) Ms. Thompson found another **11 offsite orders** tacked to a board behind Piepho's desk. (Ex. E7 at 26110.) In November, Ms. Caffes scolded Piepho for failing to review dictation, leading an appointment to be **missed by months**. (Ex. 12 at 26136.) In December 2017, Ms. Ohnstad reported two inmates had their **cancer diagnoses delayed** because of Piepho's clear failure to track and maintain the offsite appointment approval and scheduling process. (Ex. E11 at 26165; Ex. E11 at 26180–82; Ex. E12 at 26114.)

Throughout this period, Piepho was also being continuously warned to track and maintain the offsite process and develop a system to ensure offsite orders were timely completing the process. From 2014 to 2018, Piepho's job performance was assessed

negatively due to "concern over Special Duty follow up and tracking of medical appointments." (Ex. E1–3.) In February 2016, Piepho was orally reprimanded for failing to review and forward dictation to an onsite provider and otherwise track and maintain the offsite process. (Ex. E5 at 5349.) In May 2017, Piepho was placed on a PIP that ordered she ensure the offsite process is timely completed and monitor follow-up appointment orders so future appointments are not missed. (Ex. E4 at 5333; Ex. E2 at 5320–21.)

From May to September 2017, Ms. Caffes continuously communicated with Piepho regarding professional expectations, urging that tracking and maintaining the offsite process was necessary to ensure offsite appointments were not missed. (Ex. E7 at 26080, 26092–93.) In this period, Ms. Thompson also explained to Piepho that failing to timely provide onsite providers with up-to-date information impacted all of health services. (Ex. E7 at 26079.)

On November 17, just **19 days** before Piepho failed to timely track and maintain Dr. Armitage's December 6 offsite order, Piepho was served a disciplinary letter for failing to timely track and maintain the offsite process. (Ex. E8 at 3152; Ex. C3 at 68:24–79:13.) The investigation concluded by finding Piepho had not only violated her position description, but also "**was aware of her responsibilities**" and nevertheless disregarded processing a large number of offsite orders. (Ex. E10 at 5350.)

Piepho was thus placed on another PIP. On November 21 and December 1, the PIP was explained to Piepho as reiterating that, if she did not want to follow another tracking system, she would need to create one herself. (Ex. E12 at 26152.) As Ms. Caffes

61

explained, MCF-Faribault's administration "**have attempted many times to help [Piepho] create a system to track offsite [orders] that is more efficient and creates less errors**." (Ex. E11 at 26164.)

Piepho's extensive disciplinary record even contains evidence of her directly acknowledging she needed to take specific precautionary actions around time-sensitive appointments and the tracking and monitoring of follow-up care. During her 2016 disciplinary investigation, when directly asked whether she tracks urgent or time-sensitive appointments differently, Piepho responded "no." (Ex. E4 at 2626.) The critique was metabolized by Piepho. Two investigation into her wrongdoing later, she generally spoke of prioritizing time-sensitive orders, telling Ms. Karow that she aims to upload urgent and priority orders before routine ones. (Ex. E7 at 26082.)

Next, Piepho wrote to Ms. Caffes on January 12, 2018, that she had been tracking an inmate for **months** through numerous follow-up appointments. Albeit in one instance, Piepho had thus been tracking an inmate in-and-out of appointments during the exact period leading up to, and encompassing, her failure to track and maintain Allen's follow-up care. Piepho herself described the effect of tracking and maintaining the offsite process for an inmate in need of follow-up care as "**Everything is under control!!!**" (Ex. E12 at 26140.)

At end, there is simply no argument that Piepho did not know the offsite process presented risks to inmate health and thus demanded cautionary action.

## C.   Deliberate indifference

An official's violation of the Cruel and Unusual Punishments Clause is

62

consummated on her failure to take affirmative actions reasonably calculated to abate a known risk of serious harm. *Kahle*, 477 F.3d at 551–54; *Coleman*, 114 F.3d at 785–86. Piepho's deliberate indifference thus turns on whether her acts were reasonably calculated to abate the risk posed by Allen's injury and MCF-Faribault's offsite process and her misadministration thereof. *See Martin*, 742 F.2d at 475 ("Once it is established that a 'pervasive risk of harm' existed, it must be determined whether the officials reasonably responded to that risk.").

### 1.    Piepho failed to mitigate *any* risk to Allen

Setting aside scienter and deliberate indifference for a moment, there is no evidence that Piepho took *any* action to mitigate *any* risk at issue. In fact, the evidence suggests Piepho failed to even set Allen's packet out for an onsite provider's review, Piepho's first role in the offsite process.

On December 6, Allen was checked back into MCF-Faribault by Brooks and the packet was provided to Piepho. (Ex. A1 at 2354.) That same morning, Piepho wrote in Allen's progress notes "*Will* put out for MD to review." (*Id.* (emphasis added); Ex. C1 at 30:2–31:10.) The note does not say Piepho *did* put the packet out for review. Piepho's December 6 note differs in this key respect from every other note in the inmate records exhibited, which all state Piepho *did* put a packet out for review. (*See, e.g.*, Ex. L1 at 14308; Ex. L2 at 14590; Ex. L3 at 14725; Ex. L4 at 14808.)

The packet containing Dr. Armitage's December 6 follow-up order is still today in Allen's medical file, unsigned by an onsite provider. (Ex. A1 at 2470.) The packet contains a Post-It stating "1/23: Per Rhonda, do not have MD sign new report." (Ex. A1

at 2470.)

The evidence clearly establishes no onsite provider ever timely reviewed the packet containing Dr. Armitage's follow-up order. Piepho's note, the lack of onsite provider signature, the Post-It, and Piepho's history of burying orders on her desk and prematurely filing them in an inmate's medical file, together, are strong evidence that Piepho failed to even set out the offsite order.

In any event, Piepho failed to track and maintain Allen's offsite order through the completion of the process. She failed to ensure an onsite provider timely reviewed the order, failed to upload the packet to the OSS Log for Centurion's UM review, and failed to arrange the MDOC's transportation services. As a result, she unquestionably failed to mitigate any of the risk posed by failing to timely track and maintain offsite orders to the completion of the offsite appointment and scheduling process.

The facts presented undisputedly establish negligence. The only question is whether Piepho's failure to mitigate *any* of the risk at issue was in deliberate indifference.

### 2.     Piepho's failure was purposeful, if not deliberately indifferent

Allen presents the unique case where there is direct evidence of an official *purposefully* subjecting inmates to substantial risks of serious harm. As part of the September 2017 investigation into Piepho's wrongdoing, Ms. Karow directly asked whether Ms. Caffes believed Piepho's repeated failures were purposeful. (Ex. E7 at 26080–81.) Ms. Caffes answered in the affirmative, stating Piepho "was purposeful in her disregarding directions" to timely process offsite orders. (*Id.*) As Ms. Caffes explained, despite Piepho being given verbal and written directions, training, staff assistance and

regular staff check-ins, Piepho continued refusing to track and maintain the timely processing of offsite orders. (*Id.*) The investigation file also contains direct, contemporaneous evidence of Piepho purposefully refusing to process offsite orders. A note from October 2017 describes Piepho being directly ordered to begin tracking, and provide to an onsite provider, an offsite order for an already late appointment. (*Id.* at 26090.) Piepho said she would. She lied. Instead, Piepho stuck the order on a cart amongst numerous other packets. (*Id.*)

Further, three factors conclusively indicate Piepho deliberately disregarded the serious medical conditions of inmates in need of offsite care.

First, Piepho refused to adopt or hew to procedures that would mitigate the risk of time-sensitive appointments being untimely approved and scheduled. She knew she needed to take specific precautionary action to timely process time-sensitive offsite appointment orders and that Allen's December 6 offsite order was time sensitive. Nevertheless, Piepho failed to take any specific action to set out, or track and maintain, Allen's offsite order. She further failed to hew towards any of the procedural steps that would have allowed as much. Despite Piepho's own process memorandum directing her to write the identity of the onsite provider who was provided the packet, there is no progress note that says Allen's packet was placed in Dr. Shaman's mailbox. *Whitson*, 602 F.3d at 926 ("[I]t might be relevant whether … a particular protocol is used to accommodate such transports, and whether such protocol was actually followed that morning."); *Goka*, 862 F.2d at 651–52. The practice was adhered to by *other* members of MCF-Faribault's medical unit, but rarely by Piepho. (Ex. L1 at 14308 (5/3); Ex. L8 at

65

19522 (11/3); Ex. L9 at 19932 (2/24); Ex. L12 at 20332 (2/3).) She did, however, note as much after Allen returned on January 23. (Ex. A1 at 2353 (1/24).)

Second, Piepho failed to timely process *hundreds* of offsite orders and was warned that failing to do as much endangered MCF-Faribault's inmates. Nevertheless, she proceeded by refusing to take any precautionary action. In an opinion that traced the explosion of tuberculosis cases at MCF–Stillwater, then-District Judge Murphy diagnosed:

> A continued pattern of negligent conduct can also result in unnecessary and wanton infliction of pain: '[While] a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures.'

*DeGidio*, 704 F. Supp. at 955 (quoting *Todaro*, 565 F.2d at 52). As summarized by Judge Murphy, deliberate indifference is thus demonstrated by "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff." *Id.*; *see also De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 803 (8th Cir. 2022) (the same).

The point is not that negligence can satisfy the subjective prong of the Cruel and Unusual Punishments Clause. Judge Murphy is, instead, correctly noting an act may appear negligent, but the appearance is just that. When part of a larger pattern of similar incidents, a factfinder is presented evidence that an official's most recent 'mistake' was either purposeful or intentional because, when an official observes that certain acts result in bad outcomes for inmate health, failing to alter future behavior to obviate the bad outcomes establishes the official cares so little about inmates that she has refused to learn

66

any lessons or take any corrective actions. *DeGidio*, 704 F. Supp. at 955; *De Rossitte*, 22 F.4th at 803; *see also Kahle*, 477 F.3d at 551–52. Naturally, as a pattern grows, a finding of deliberate indifference becomes more well founded. *DeGidio*, 704 F. Supp. at 955.

Here, the evidence is ample and conclusive. Piepho was *directly* involved in failing to track and maintain the offsite appointment process in *hundreds* of instances over just 2017. Nevertheless, Piepho refused to take any cautionary actions that would have prevented outcomes like that which cost Allen his hand. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 541 (3d Cir. 2017) ("This pattern of disinterested conduct 'separates this complaint from ordinary allegations of medical malpractice.'" quoting *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)); *Schaub*, 638 F.3d at 917 ("VonWald took no steps to assure himself that the ADC could in fact handle Schaub's medical needs ….").

Third, Piepho's deliberate indifference is evidenced by her refusal to ever take accountability for the offsite process and her failures. As Judge Murphy explained, refusal to take accountability in the face of persistent inmate suffering inflames ill-conceived procedures and evidences deliberate indifference:

> Dr. Allan's disclaimer of any responsibility for policy making reveals another serious flaw in the way health care is delivered at Stillwater. No one claims ultimate responsibility for the many supervisory functions within the health services unit. The passing of blame and responsibility between the Department of Health, the administrative director of health services, and the staff physicians has been discussed at length earlier. Each person describes his or her role narrowly, and disclaims ultimate responsibility for directing the effort at controlling tuberculosis. Plaintiffs have shown through the great weight of the evidence that this failure of coordination persists and is a reason why Stillwater's response to the tuberculosis epidemic lagged…. None of the men responsible for health

care administration has spent more than about one-half of his time at these duties. None has taken any responsibility for developing an infectious disease prevention and control policy at Stillwater, or accepted overall responsibility for the quality of health care delivered. That continuing deficiency contributed to the outbreak and spread of tuberculosis.

*DeGidio*, 704 F. Supp. at 957–58. The lengths with which Piepho went to deny any responsibility over any failed offsite appointments are stunning. She blamed everyone around her, never once accepting fault, even in the face of direct evidence to the contrary. In one particularly shocking exchange from 2018, after numerous sustained disciplinary investigations into her wrongdoing, Piepho denied ever being investigated or having any issues as MCF-Faribault's Special Duty Coordinator.

On this record, no reasonable jury could find that Piepho anything less than purposeful or deliberately indifferent to Allen's serious medical need.

## III.   Causation

As noted above, an official violates the Cruel and Unusual Punishments Clause by failing to take actions reasonably calculated to mitigate a substantial risk of serious harm. Causation, injury and damages are not a piece of the Eighth Amendment framework itself, but stem from 42 U.S.C. § 1983 and accordingly, are a function of state tort concepts. *See Schaub*, 638 F.3d at 921 (8th Cir. 2011) (citing *Ricketts v. City of Columbia*, 36 F.3d 775, 779–80 (8th Cir. 1994)).

Causation is generally a question of fact. *Id.* (citing *Parrish v. Ball*, 594 F.3d 993, 1000 (8th Cir. 2010)). The issue, however, may be decided as a matter of law where the causal link is clear. *Id.* (citing *Ricketts*, 36 F.3d at 779–80). Here, legal and proximate causation are clear. Defendants' *own* expert, Dr. Scott McPherson ("Dr. McPherson"),

68

opines the delay in treatment caused Allen's ongoing loss of right hand function.

Dr. McPherson reported that Allen's main problems are "lack of range of motion, [and] weakness along with fatigue." (Ex. J1 at 10.) He had no suggestions for "future, medical, or rehabilitative care." (*Id.*) He agreed that "Allen continues to have functional limitations and symptoms **and the delay in treatment would have been a contributing factor.**" (*Id.* at 11.) (emphasis added). He agreed that the right hand "does have a permanent disability," stating that "his current mobility of the hand along with strength and endurance will stay the same and is permanent." (*Id.*) He agreed that "the prolonged immobilization did result in increased stiffness and loss of range of motion." (*Id.*) Regarding Plaintiff's answer to Defendants' Interrogatory 10, asserting causation, he gave a vague but telling answer: "I do believe it would be reasonable to state specific factual summary of the assertions of causation." (*Id.* at 12.) Regarding Plaintiff's answer to Defendants' Interrogatory 11, asking what injuries were caused by defendants, he agreed that "the fracture to the right hand with the prolonged immobilization has resulted in less than optimal recovery with decreased range of motion, decreased grip strength, and some low level pain with heavy use by Mr. Allen's subjective history." (*Id.*)

In sum, Dr. McPherson opined that:

> I would state that his current limitations are a direct result of the righthand injury that occurred on December 3, 2017. **I do believe that the prolonged immobilization until January 23, 2018, substantially contributed to his residual ongoing symptoms.** I cannot rule out that even if his treatment had been optimal that he may have had some residual symptoms of decreased mobility and decreased strength.

(*Id.* at 12-13.) (emphasis added.)

He also opined:

**I believe the main problem is that when follow up was delayed to six weeks from the time of the injury** with the small ring and middle fingers splinted out in an extended position leads to stiffness especially at the MCP level because the ligaments at the MCP joint are in their shortest position. The finger that has the maximum amount of stiffness is the small finger and that did not even sustain a fracture. **The fractures are really not the issue here; it is the soft tissue compromise and arthrofibrosis around the joints that resulted from prolonged immobilization.**

(*Id*. at 14.) (emphasis added).

Dr. McPherson's opinions do not contradict the findings of Dr. Armitage, Allen's treating physician. (*See* Ex. J2 at 4.) There is no disputed issue of fact regarding causation.

## CONCLUSION

For all these reasons, Allen's motion should be granted.

DATED: December 29, 2025          **BENNEROTTE & ASSOCIATES, P.A.**

By:    *s/ Vincent J. Moccio*_____
Vincent J. Moccio (MN# 184640)

3085 Justice Way, Suite 200
Eagan, MN 55121
612-799-5160
vincent@bennerotte.com

AND

Vincent W. Moccio (MN#0402190)
115 Valleyview Place
Minneapolis, MN 55419
612-741-6342
vincentmoccio@gmail.com

**ATTORNEYS FOR PLAINTIFF**

70